GEORGE T. BURROUGHS ET AL. *v.*
FRANCIS J. GARNER ET AL.
T/A BRANDYWINE FARMS
JOINT VENTURE

[No. 1154, September Term, 1978.]

*Decided September 7, 1979.*

The cause was argued before MORTON, MOORE and LOWE, JJ.

*Jess Joseph Smith, Jr.,* for appellants.

*Leo William Dunn, Jr.,* with whom were *Dunn & Emig, P.A.* on the brief, for appellees.

MOORE, J., delivered the opinion of the Court.

This appeal involves the interpretation of several release of lien provisions contained in a "deferred purchase money" second deed of trust. We are asked to determine whether the trial court (David Gray Ross, J.) correctly ruled, in an equity proceeding in which a real estate foreclosure and an action to enjoin it were consolidated, that the appellees-mortgagors [1] were entitled to the release of 29.8 acres out of a 147.8 acre tract pursuant to the terms of the second deed of trust.

## I

In September 1971, the Brandywine Farms Joint Venture consisting of 11 members was formed pursuant to a written agreement for the purpose of acquiring and developing, for residential purposes, 147.8 acres of unimproved land in Prince George's County.[2] The purchase price of $406,654.60 was paid by the assumption of an existing first deed of trust in the sum of $97,089.60, a second deed of trust securing three separate notes [3] aggregating $216,034.44, and cash in the sum of $93,530.56, plus assorted closing costs.

---

1. The security device involved was a deed of trust, not a mortgage. Deeds of trust are widely used in Montgomery and Prince George's Counties and "in practice . . . are foreclosed in almost the same manner as power of sale mortgages." Editor's note, Maryland Rule W77 (Deed of Trust — Foreclosure — Release — Removal). In Le Brun v. Prosise, 197 Md. 466, 473-74, 79 A.2d 543, 547 (1951), the Court of Appeals observed: "For most purposes any such deed of trust *is* a mortgage, Manor Coal Co. v. Beckman, 151 Md. 102, 115-116, 133 A. 893, and is subject to some (but not all) statutory provisions relating to mortgages." The statutory provisions were formerly contained in Code, Art. 66 and now appear in Code, Real Prop. Art., Sec. 7-101, *et seq.,* with the exception of the Secondary Mortgage Loan Act which remains as sections 39 through 70 of Article 66. For a discussion of the various distinctions in Maryland between mortgages and deeds of trust, *see* Comment, *Deeds of Trust and Article 66, Section 24 of the Maryland Code,* 13 Md.L.Rev. 114 (1953). *See also* n.14, *infra.*

2. The origin of the Brandywine Farms Joint Venture is a bit involved. In September 1970, the owners of the tract in question entered into a contract for the sale of the property to Valhalla Vacationlands, Inc. Valhalla suffered financial difficulties and eventually assigned its rights under the contract of sale to several of its principals who, with some additional people, then formed Brandywine Farms Joint Venture. The infusion of additional capital from the new joint venturers' contributions allowed the Joint Venture to complete the purchase of the property.

3. These notes were dated September 24, 1971 and provided for repayment of principal in nine (9) equal annual installments, plus 7% interest. One of the noteholders, Edward C. Freeman, the real estate broker in the original acquisition of the tract by appellees' vendors, is also a member of the Joint Venture and of its three-member "Managing Committee." Bobby R. Owens,

The second deed of trust dated September 24, 1971 was on a standard form generally in use in Prince George's and Montgomery Counties and in the District of Columbia. In addition, several typewritten provisions were included to allow the orderly and periodic recording of subdivision plats and the release of parcels from the deed of trust lien. These provisions now stand at the heart of the controversy between the parties in light of the Joint Venture's default in 1977 and its subsequent desire to have a portion of the property released from the deed of trust lien.

Before recounting the events leading up to this litigation, it is necessary that we set out the pertinent typewritten sections of the deed of trust. With respect to plats of subdivision and similar type instruments, the deed of trust imposed mandatory duties upon the trustees at the request of the Joint Venture:

> 1) That the Trustees hereunder, without further authority from the parties secured hereby, and without any fees or payments on account of said notes secured hereby, *shall be authorized and required at the party of the first part's request, at any time and from time to time, to join in the recording of and to execute consents and approvals* with respect to plats of subdivision, street dedication plats or deeds, sanitary sewer, water, storm drainage, gas, electricity, telephone and other utility rights-of-way and easements, declarations of covenants, agreements *and other similar-type instruments which may be required at any time and from time to time with respect to the orderly development of the property.* (Emphasis added.)

Three separate typewritten paragraphs dictated the circumstances under which releases from the deed of trust lien could be obtained. Twenty-five acres were to be released from the deed of trust lien based upon the consideration

who with his wife is another noteholder, is also a member of the Joint Venture. In addition, we observe that the noteholder secured by the first deed of trust is Spencer E. Stephens, who is likewise a Joint Venture member.

provided by the cash payment at settlement. This twenty-five acre release was governed by the following provision:

4) The Trustees are authorized without further approval by the noteholders to execute one or more releases of the property conveyed herein at the request of the maker hereof or its successors and assigns, of 25 acres in one or more parcels upon the following conditions:

(a) Payment from the maker hereof or its successors or assigns to the party secured hereby of the sum of $10.00;

(b) Recordation among the Land Records of Prince George's County, Maryland of a plat subdividing at least the amount of acreage which is to be released hereunder;

(c) That the property not released hereunder shall have an easement as wide as required by the subdivision requirements of Prince George's County so that said property will not be landlocked. Said right of way may be either dedicated by record plat or granted in the release to be executed hereunder.

As part of the development plan, the deed of trust provided for additional acreage to be released "subsequent to the release of the twenty-five acres" described in the foregoing paragraph. It provided that upon the payment of "any and every" required installment of principal, "there *shall* be released from the lien of this Deed of Trust an amount of acreage computed at the rate of $2,750.00." (Emphasis added.) If both interest and principal were paid in advance of the mandated schedule, then "any of the land secured herein *may* be released . . . from time to time upon payment on account of the debt secured hereby of . . . $2,750.00 per acre." (Emphasis added.)

No provision was made in the deed of trust instrument for the location of property to be released within the 147.8 acre tract except for a requirement that "all releases subsequent to the 25 acres to be released at no cost to the maker hereof shall be contiguous and adjacent to said 25 acre tract." [4]

Sometime in April 1972, the Joint Venture engaged the services of W. Stanley Machen, a professional surveyor of many years' experience, to assist them in the work of subdivision and development. He subsequently drafted three successive preliminary plats of subdivision for portions of the property which were all given preliminary approval by the Maryland-National Capital Park & Planning Commission's Prince George's County Planning Board. Mr. Machen also prepared a final plat dated June 1, 1978 encompassing 50.069 acres, to which reference is hereinafter made.

From the beginning the Joint Venture was unable to make the scheduled payments of interest and principal due under the second deed of trust. For the first two payments, due September 24, 1972 and 1973, respectively, the noteholders orally agreed to accept interest payments only. In October 1974, payments of principal were made on two of the three notes in the sum of $6,585 each, and interest was also paid on each of the two notes in the sum of $4,609.50.[5] This, too, was done with the noteholders' approval. In 1975, by further agreement with the noteholders, interest only was again accepted but the interest rate was increased to 9% and a payment in the sum of $5,233.85 was made on each of the two notes. The same payments were made in 1976. In 1977,

4. An agreement of sale dated September 24, 1970 between the record owners of the tract and Valhalla Vacationlands, Inc., whose rights were eventually acquired by the Joint Venture, provided for the release of 30 acres at settlement. An attached plat showed a location for the 30 acres in the northerly portion of the total acreage. The agreement also provided for subsequent releases to run in a southeasterly direction. At settlement, this was reduced to 25 acres and, as noted, the language of the deed of trust contained no reference to the location of the 25 acre parcel. This agreement of sale was not admitted into evidence by the chancellor.

5. Apparently, no cash interest payments were ever made to the third noteholder and Joint Venture Managing Committee Member, Edward C. Freeman, although the record is unclear on this point. It would seem from the testimony heard by the chancellor that Mr. Freeman received his interest payments in the form of set-offs against assessments levied on the various Joint Venturers. It is clear that no principal was ever paid on the third note.

however, no payments were made of either principal or interest; [6] the Joint Venture also did not pay the property taxes for 1976-77 and 1977-78, which led to a tax sale on May 8, 1978.[7]

On June 18, 1978, foreclosure proceedings were instituted in the Circuit Court for Prince George's County by George T. Burroughs and Bessie Mae Cox, substitute trustees. The foreclosure sale was scheduled for July 6, 1978. Prior thereto, on June 27, 1978, the Joint Venture filed a bill of complaint to enjoin the foreclosure and for additional relief, naming as defendants the two substitute trustees and Edward C. Freeman, Joint Venture Managing Committee member.[8] The gravamen of the bill of complaint was that, in accordance with the provisions of the second deed of trust, the members of the Joint Venture were entitled to the release of 29.8 acres from the deed of trust about to be foreclosed. The 29.8 acres consisted of the 25 acres specified in paragraph 4 of the deed of trust to be released in consideration of the down payment, plus 4.8 acres on account of the principal payments made in 1974 prior to default.

It was also alleged in the bill that the advertisement for the sale of the property at public auction "includes all of the property described in the deed of trust," and that the trustees had refused to release the portions to which the Joint Venture was entitled. The principal relief sought was not that the foreclosure sale be enjoined but that the substitute trustees release the 29.8 acres from the lien of the second deed of trust.

The cases came on for hearing on July 5, 1978, one day before the scheduled foreclosure sale. Prior to the close of proceedings on that day, the chancellor ordered a

---

6. In November 1977, the Managing Committee of the Joint Venture attempted, unsuccessfully, to avert threatened foreclosure, by a special assessment upon each member of $3,000.

7. One of the Managing Committee members, Robert J. Garner, attempted to pay one year's taxes on May 19, 1978; however, the check for $694.92 was returned because the county required full payment of all past due taxes in order to redeem a property after a tax sale. The amount owed at that time was $1,474.50.

8. See n. 3, supra. Mr. Freeman had refused to sign the final plat prepared by Mr. Machen, stating that it contained errors.

consolidation of the two cases pursuant to Rule 503. He stated:

"I will do that to give notice to any bona fide purchaser who may bid on this property tomorrow. I think it would be unfair to have someone come tomorrow and not know of these proceedings."

At the sale the following day, the property was purchased for $200,000 by the parties secured under the second deed of trust.[9] The chancellor continued the case from July 5 to July 18, 1978, when additional evidence [10] was received, oral argument was heard, and the court delivered an oral opinion. Subject to the submission of written orders, the court denied the injunction and stated it would ratify the foreclosure sale subject to the release of the 29.8 acres.

The court also announced that the provision for an easement in accordance with paragraph 4(c) of the deed of trust, "so that [the remaining property] will not be landlocked," remained to be dealt with and allowed the parties an opportunity to "work it out." [11]

No such resolution of the matter eventuated, however. Indeed, on September 21, 1978, the chancellor signed an Order in the Joint Venture's equity case that the substitute trustees (a) "join and execute that particular plat prepared by W. Stanley Machen, entitled, Section I Brandywine Farms. . . ," and (b) "execute a release, releasing from the lien in effect of the deed of [sic] trust 29.8 acres of land, said acreage to be described in the release and a copy of said release to be filed in these proceedings."

---

**9.** We note that the typewritten portion of the deed of trust contained an express agreement "that the noteholders waive the recovery of any deficiency decree against the grantor, its successors or assigns, in the event of foreclosure. . . ."

**10.** The court heard additional testimony from Francis Burgess, a noteholder. It also received, without objection, an "Amended Statement of Claim" showing the balances due on the deed of trust notes: Note No. 1 (Owens), $66,524.99; Note No. 2 (Burgess), $66,524.99; Note No. 3 (Freeman), $94,918.50. State and county taxes due for 1976-77 and 1977-78 were $1,474.50.

**11.** The easement, under paragraph 4(c) of the deed of trust, "may be either dedicated by record plat or granted in the release to be executed hereunder."

The following day, the chancellor signed an order of ratification of the foreclosure sale "subject to the release of 29.8 acres in Equity E-4618." A week later the substitute trustees and Edward C. Freeman filed a petition for reconsideration. A hearing on the petition was had in open court on October 19, 1978, and an order of denial was entered the same day.

From these orders, the substitute trustees and Edward C. Freeman have appealed. They raise these issues: (a) Whether the deed of trust contained conditions precedent to the release of 29.8 acres and, if so, whether they were "in default or were waived"; (b) whether appellees are subject to equitable estoppel; (c) whether appellees are barred by laches; and (d) whether the lower court had jurisdiction.

## II

Appellants contend, in effect, that there were both *general* and *specific* conditions precedent to the release of the 29.8 acres from the deed of trust and that these conditions remain unsatisfied. The general conditions include the standard deed of trust provisions requiring the mortgagors to keep current the payments of principal, interest, and taxes. The claimed special conditions were the conditions set forth in the typewritten section of the deed of trust: (1) payment of the sum of $10.00; (2) recordation of a plat subdividing the acreage to be released; and (3) the preparation of an easement protecting the remaining property from being landlocked. Appellants assert that both the appellees' default and their failure to record a plat of subdivision bar them from any entitlement to a release.

Appellees, notwithstanding their default, claim a right under *Leisure Campground v. Leisure Estates,* 280 Md. 220, 372 A.2d 595 (1977) to a release of the acreage in question. They concede the existence of the three specific conditions upon the execution of a release from the lien of the deed of trust but contend that the chancellor correctly found that the first was *de minimis,* that the second was waived, and that

the third could be accomplished by appropriate language in the court's order.

We begin with the *Leisure* case. There, the mortgagor in a purchase money mortgage transaction involving 154 acres near Ocean City appealed from an order ratifying a foreclosure sale of the property. It was contended that, under the terms of the mortgage, the mortgagor was entitled to the release of 40 acres in consideration of $75,000 paid at the time of settlement.[12] The mortgagee contended that the mortgagor's right to the release of the 40 acres was lost upon default under the mortgage, or, at all events, when foreclosure was initiated, and also that the release clause was unenforceable because it did not specify the location of the 40 acres. Vacating an order of the Circuit Court, the Court of Appeals held, in an opinion by Judge Digges, that the right to request the release "survived both default and foreclosure, and that the clause in question is enforceable. . . ." [13] *Id.* at 222, 372 A.2d at 597. The following rule was enunciated:

> "Consequently, we now hold that, absent a contractual provision to the contrary, if a mortgagor makes full payment for a partial release of property prior to a default, he is not prevented from enforcing his accrued rights under the clause so long as he is capable of doing so without interfering with any interest nonparty bona fide purchasers have acquired at a foreclosure sale."

*Id.* at 225, 372 A.2d at 598-99.

---

12. The release clause contained the following language:

"[T]he Mortgagor is entitled from and after the date hereof, at its request, in consideration of the monies paid to the Mortgagee on account of the purchase price, to have released, without further payment, forty (40) acres of the property secured by this Mortgage."

13. The court rejected the mortgagee's contention that Gerber v. Karr, 231 Md. 180, 189 A.2d 353 (1963) was controlling. The holding of *Gerber* that "a mortgagor cannot call for a partial release after defaulting on his obligations under the mortgage," *id.* at 185, 189 A.2d at 355, was limited to the facts there present: the mortgagor had not paid for the release prior to default and the deed of trust indicated that no right of release was intended after default. Leisure Campground v. Leisure Estates, 280 Md. 220, 224, 372 A.2d 595, 598 (1977).

The Court, therefore, rejected the mortgagee's primary contention that the mortgagor's failure to request the release of the 40 acres until 3 days prior to the foreclosure sale divested it of its release right. Judge Digges stated:

> "Therefore, the mortgagor's default in this case did not extinguish its release right inasmuch as full payment was made prior to default, and there is nothing in the instrument indicating that the parties intended the right to be divested upon default or foreclosure."

*Id.* at 226, 372 A.2d at 599.

There are striking parallels between the facts and circumstances in this case and those in *Leisure.* That the security device in the instant appeal is a deed of trust, rather than a mortgage, is not a point of distinction.[14] In each case a deferred money purchase of unimproved acreage acquired for purposes of development by the mortgagor was involved. Default on the mortgage occurred in each instance. Similarly, no request for a release was pressed until after default and after the commencement of foreclosure proceedings.[15] In our

---

14. As we noted in n. 1, *supra,* for most purposes the differences between mortgages and deeds of trust are immaterial. In both documents the purchaser-debtor conveys bare legal title to the property — to either the mortgagee or the trustees. Unless there has been occasion to question the applicability to deeds of trust of specific statutory provisions dealing with mortgages, the Court of Appeals has recognized the similarities between the two species of documents: "The conveyance therefore, though called a deed, is in substance and purpose a mortgage, although it differs from the conventional mortgage in that the property pledged as security for money loaned is conveyed to a third person charged with the duty of enforcing the lien instead of to the lender directly." Manor Coal Co. v. Beckman, 151 Md. 102, 115, 133 A. 893, 898 (1926). *See also* Le Brun v. Prosise, 197 Md. 466, 473-74, 79 A.2d 543, 547 (1951); Baker v. Dawson, 216 Md. 478, 486, 141 A.2d 157, 165 (1958).

We have elucidated this point to further emphasize the applicability of the Leisure rationale to the instant situation. As Judge Digges pointed out: "Neither default nor institution of foreclosure in any way negates the fact that where full payment has been made, the mortgagor has, at the least, complete equitable ownership of the property, and the mortgagee [trustee] has, at most, only bare legal title to it." Leisure Campground v. Leisure Estates, 280 Md. 220, 224, 372 A.2d 595, 598 (1977). Once the appellees made full payment for the release of 29.8 acres under the second deed of trust, they obtained, at the minimum, complete equitable ownership; the trustees, at most, possessed only bare legal title to the acreage.

15. The typewritten provisions of the second deed of trust, while inartfully drawn, nevertheless contain no patent ambiguities. In interpreting the

judgment, the rule of *Leisure* is controlling, for the following reasons:

(1) Brandywine Farms made full payment for the release of the 25 acres at the time of settlement in 1971 and of the 4.8 acres by payments toward principal in 1974, long before the default in 1977 and foreclosure in 1978.

(2) There are no provisions in the deed of trust which disallow release subsequent to default or the institution of foreclosure proceedings, nor is there anything in the record indicative of an intention to defeat vested rights of release.

(3) Release of the 25 acres was contemplated to take place in the future and such release or releases by the trustees were authorized "without further approval by the noteholder," upon the conditions specified in the second deed of trust.[16]

(4) Release of acreage in consideration of payments of principal was mandated by the provision that: "Upon payment of any and every required installment of principal, *there shall be released* from the lien of this Deed of Trust an amount of acreage computed at the rate of $2,750." (Emphasis added.)

(5) The appellees' request for the release after default but prior to the foreclosure sale did not interfere "with any interest nonparty bona fide purchasers have acquired at a foreclosure sale." *Leisure, id.* at 225, 372 A. 2d at 598-99. One of the substitute trustees, Mr. Burroughs, announced at the sale that there was a pending suit involving the property, and, indeed, the purchasers at foreclosure were the noteholders themselves.

---

provisions contained therein, we must search for the understanding that a reasonable person in the same position would attach to the language used by the parties. The specific and subjective understanding of the litigants here is irrelevant in light of their objective intention manifested by the unambiguous words contained in the deed of trust. Teamster's Local 639 v. Reliable Delivery Service, Inc., 42 Md. App. 485, 401 A.2d 191 (1979); Chesapeake Isle, Inc. v. Rolling Hills Development Co., 248 Md. 449, 453, 237 A.2d 1, 3 (1967). *See also* Ray v. Eurice, 201 Md. 115, 127, 93 A.2d 273, 279 (1952). Given this premise, we have little difficulty in applying the rule of *Leisure* to these facts.

**16.** Moreover, the trustees may not refuse to execute a consent and approval with respect to a plat of subdivision. Once a consent and approval is requested by the Joint Venture, the trustees are "required" to execute it.

We are not unmindful that appellants, in an effort to avoid the impact of *Leisure,* contend that recordation of a subdivision plat and payment in full of the entire indebtedness upon default, preclude release after default in *this* case. Their position cannot be sustained. The requirement of recordation of a plat, which applies only to the 25 acres, is a condition precedent to the execution of a release by the trustees; recordation may occur prior to default or thereafter. The instrument does not require recordation prior to default. Again, the provision requiring payment in full of the entire indebtedness upon default is standard and was undoubtedly present in *Leisure*; it has no bearing upon the mortgagors' right to request a release for which full payment was made prior to default.

We recognize that appellants' claims stem in part from the chancellor's determination that a condition precedent existed when he said:

> "You have to come to grips with the question as to (4)(b), whether or not the recordation among the Land Records is in fact a condition precedent.
>
> Two, the release: I find it as *a fact that it is a condition precedent, but at the same time that reasonable efforts have been made on the part of the petitioner in this case to put a plat on record, they have done everything they can. The failure of the trustees to sign that release [plat] amounts to a waiver of that condition,* and therefore, while it isn't [sic] a condition precedent, it has been waived." (Emphasis added.)

It is apparent, however, that the above analysis was not appropriate for it failed to make a crucial distinction between a vested entitlement to a release under the principles of the *Leisure* case and mere conditions placed upon the formal execution of the release by the trustees. In our view, under the terms of the deed of trust, the appellees upon the payment of $93,530.56 at settlement obtained a vested right to have 25 acres released from the lien of the second deed of trust. The conditions expressed in the deed of trust were not

conditions upon the appellees' right to the release, but rather they were conditions precedent to the trustees' execution of the release. Of course, the release of lien as to the additional 4.8 acres is not bound by the conditions at all, since the deed of trust separately provided for an absolute and mandatory release of acreage upon every payment of principal. The language of the deed of trust is clear, unequivocal, and free from ambiguity, and it places this case squarely within the holding of *Leisure.*

Appellants have also challenged the release provisions, asserting that the failure therein to describe and identify the property with sufficient certainty is a fatal flaw because "there are no facts in the instant case to suggest that the parties intended the mortgagor to select the acreage to be released." We return, for the moment, to Judge Digges' opinion in *Leisure Campground v. Leisure Estates,* 280 Md. 220, 372 A.2d 595 (1977), where the Court dealt with the failure of the release clause to specify the location of the 40 acres. The Court stated:

> "While it is certain that the parties could have been more explicit, we believe the language of the release clause here — viewed in light of the fact that the mortgage was executed for the purpose of facilitating a land development venture to be undertaken exclusively by the mortgagor — clearly and unambiguously entitles the mortgagor to request and have released forty acres of its choice. Under these circumstances, it is inconceivable to us that, if the mortgagee or some third party was meant to have any control as to which parcel of land was to be selected for release, there would be no additional words intimating that intention."

*Id.* at 227-8, 372 A.2d at 600.

And the Court made the additional observation that:

> "It is clear that the provision before us giving the mortgagor the right to select enables the court, with the aid of a sufficient description provided by the mortgagor as to the acreage so selected, to

determine with certainty what property the parties intended to cover in the clause — under these circumstances, the tract to be chosen by the mortgagor *is* the property intended by the parties. *See Lambert v. Jones,* 540 S.W.2d 256, 259 (Tenn. App.), *cert. denied,* Tenn. Sup. Ct. (1976). We conclude that where, as in the present case, the parties evidence an intent that the mortgagor is to select the land, such an agreement will not be unenforceable merely because there is not a metes and bounds description of the portion to be released. It would be wholly unreasonable, and would greatly reduce or destroy the efficacy of partial release clauses, to require such specificity at the time the parties make the mortgage contract."

*Id.* at 229-30, 372 A.2d at 601.

In the instant appeal, the second deed of trust evidences an intention by the parties to the transaction that the Joint Venture would direct the residential development of the 147.8 acre tract. While the trustees were required to give their consent and approval to plats of subdivision and other similar instruments prepared by the Joint Venture under the terms of the second deed of trust, they had no official role in the preparation of subdivision plans. We believe that all of the circumstances presented in this case indicate that the Joint Venture, as the owner and developer of the Brandywine Farms tract, was to develop the tract as it best saw fit. There is no language in the second deed of trust indicative of an intention to allow the trustees or noteholders any input into the selection of property to be released, and therefore, the power to select such acreage must be vested in the Joint Venture.[17]

---

17. We note that two of the noteholders have a voice in the management of the Joint Venture because of their membership in the Joint Venture. *See* n. 3, *supra.* As indicated in Part IV, *infra,* the chancellor, on remand, may properly apply traditional equitable principles in supervising the appellees' selection of the 29.8 acres to be released from the second deed of trust lien, taking into account the intention of the parties as evidenced by the preparation of the subdivision plats, the second deed of trust itself, and the other evidence admitted at the hearing below.

### III

Appellants' remaining assignments of error raise the doctrine of equitable estoppel and laches as a bar to the relief prayed by the appellees. A jurisdictional defect is also asserted — that all of the members of the Joint Venture were necessary parties plaintiff to their bill of complaint but only two were named.

Equitable estoppel has no application to the facts and circumstances involved in this appeal. As Judge Barnes stated for the Court of Appeals in *Savonis v. Burke,* 241 Md. 316, 216 A.2d 521 (1966), cited by appellants, the doctrine operates "to prevent a party from asserting his rights where it would be inequitable and unconscionable to assert those rights." *Id.* at 319, 216 A.2d at 523. The Court went on to say:

> ". . . It is essential for the application of the doctrine of equitable estoppel that the party claiming the benefit of the estoppel must have been misled to his injury and changed his position for the worse, having believed and relied on the representations of the party sought to be estopped."

*Id.* at 319, 216 A.2d at 523. Appellants' claim to equitable estoppel, as stated in their brief is as follows:

> "Without any long or involved discussion, [by not] paying the principal and interest when due, by not requesting any trustee to sign any plat or release before instituting suit, and by letting the property be purchased by a third party at a tax sale, the Appellees are barred by equitable estoppel from asserting their rights to the release of any property described in the deed of trust in question."

It is patent that the elements of equitable estoppel are not here present; nor is there any indication that appellants suffer from inequity or unconscionability.

As for the claim of laches, the Court of Appeals has had occasion to state that this doctrine "is an application of the general principles of estoppel." *Oak Lawn Cemetery v.*

*Baltimore County,* 174 Md. 280, 291, 198 A. 600, 605 (1938). The Court has also defined laches as "inexcusable delay, without necessary reference to duration" in the assertion of a right. *Lipsitz v. Parr,* 164 Md. 222, 226, 164 A. 743, 745 (1933). Change of position and prejudice from the delay must be shown. *Salisbury Beauty Schools v. State Board of Cosmetologists,* 268 Md. 32, 63, 300 A.2d 367, 385 (1973).

With particular reference to the assertion of a right to partial release of property from the lien of a mortgage, the Court observed in *Leisure Campground v. Leisure Estates,* 280 Md. 220, 225, n. 3, 372 A.2d 595, 599, n. 3 (1977):

> "Of course, should a mortgagor inexcusably delay the assertion of his right, such a delay might constitute laches. The defense cannot successfully be raised here, however, since the mortgagee has shown no prejudice or disadvantage arising out of the mortgagor's delay in seeking enforcement of the release provision. *See, e.g.,* Anne Arundel Co. Bar Ass'n v. Collins, 272 Md. 578, 584, 325 A.2d 724, 728 (1974); Salisbury Beauty Schools v. St. Bd., 268 Md. 32, 63, 300 A.2d 367, 385 (1973)."

In *Leisure,* the mortgage was executed on August 4, 1972, and the mortgagor paid accumulated interest until February 1974 but made no subsequent payments of interest or principal. Foreclosure proceedings were instituted on June 4, 1975. On July 17, three days before the sale, the mortgagor for the first time requested the release of the 40 acres paid for at settlement, without specifying their location.

In the instant appeal, as in *Leisure,* the request for the release was made after default but prior to the foreclosure sale. The precise time of the request is not clearly established in the record; however, the Joint Venture's bill of complaint filed on June 27, 1978 clearly constituted a demand for the release.[18] In addition, there was testimony before the

---

18. Although there are no Maryland cases on point, we believe that the institution of the equity proceeding by the appellees, having as its paramount purpose the release of the 29.8 acres, is an unequivocal demand by the appellees upon the trustees for the release of the acreage. Such a conclusion was reached by the Louisiana Supreme Court in Schexnayder v. Capital Riverside Acres, Inc., 170 La. 714, 129 So. 139 (1930).

chancellor leading him to conclude that, prior to the commencement of the foreclosure proceedings, the appellants refused to sign a record plat, the recordation of which was a condition to the execution by the trustees of the release.[19]

We do not believe there was evidence below of "inexcusable delay" in the assertion of the right. The Joint Venture timely engaged an experienced professional surveyor; beginning in April 1972 he worked with Mr. Freeman and Mr. Satterfield of the Joint Venture in the preparation of plats of subdivision. At least three preliminary plats were prepared and approvals obtained from state and local agencies. A zoning map amendment, the surveyor testified, of the Patuxent-Upper Marlboro section of Prince George's County affected the zoning of the property and caused the undoing of the second preliminary plat. A record plat was finally prepared in accordance with a third preliminary plan, affecting 50.069 acres, and was approved by the agencies involved. According to the surveyor, Mr. Machen, the only additional requirements for the final approval by the Maryland-National Capital Park and Planning Commission of the record plat, which bore a date of June 1, 1978,[20] were: (a) the execution thereon of consents by the trustees and by the appropriate representatives of the Joint Venture, and (b) the posting of a bond for the construction of the road. The foregoing, in our judgment, discloses that a significant amount of time, and presumably of expense, was invested by the Joint Venture in land planning and amply supports the finding of the chancellor that "reasonable efforts have been made on the part of the petitioner in this case to put a plat on record," a necessary condition to the execution of a release by the trustees.

Furthermore, appellants have failed to sustain their burden of showing prejudice caused by appellees' assertion of the right to the release. Their references to nonpayment of taxes, cessation of payments of principal and interest, and the costs

---

**19.** On the record before us, which we have carefully reviewed, we could not find the chancellor's conclusion in this respect "clearly erroneous." Maryland Rule 1086.

**20.** This was the plat which the chancellor ordered the substitute trustees to execute by his Order of September 21, 1978 in Equity E-4618.

of foreclosure are relevant, of course, to appellees' default under the mortgage, but do not establish "change of position and prejudice" in connection with the request for the release. We conclude, therefore, that appellants' claim under the doctrine of laches must fail.

Appellants' final contention, that all of the members of the Joint Venture were necessary parties in the equity suit on behalf of the Joint Venture, must also be rejected. The action was brought on behalf of the Joint Venture by Robert J. Garner and Francis J. Garner, as "Managing Joint Venturers." Joined as parties-defendant were the two substitute trustees, George T. Burroughs and Bessie M. Cox, as well as Edward C. Freeman, also designated as a Managing Joint Venturer of Brandywine Farms, presumably named because of his admitted refusal to sign the record plat.

The Joint Venture agreement, received in evidence, provided specifically for the appointment of a Managing Committee to act on behalf of the Joint Venture. Paragraph 4 provided:

> "The joint venturers hereby appoint a committee of three joint venturers who shall be Robert J. Garner, Francis J. Garner and Edward C. Freeman, to do any and all acts and enter into and execute any and all agreements or other instruments necessary, proper or expedient in its judgment, to carry out and perform this Agreement and generally to transact the business of the venture in such manner as in its discretion it may deem for the best interests of the venture. *The committee shall have a chairman and shall act by majority vote.*" (Emphasis added.)

The agreement thus contained a broad delegation of authority to the three members of the Managing Committee; and the specific provision that the Committee act by a majority vote clearly conferred upon Robert and Francis Garner the authority to prosecute an action to assert the Joint Venture's entitlement to the release of the 29.8 acres. Contrary to the suggestion made in appellants' brief, the equity proceeding which appellees initiated was not akin to

a foreclosure action and the authorities cited by the appellants are inapposite.

## IV

Although we hold that the chancellor properly recognized the right of the Joint Venture to a release of 29.8 acres from the lien of the deed of trust, we also perceive that not all issues have been decided and that further proceedings are necessary in order to award complete relief and to avoid circuity of action. *Aiello v. Aiello,* 268 Md. 513, 518, 302 A.2d 189, 191 (1973).

Specifically, we observe: 1) that the 50.069 acre plat which the court ordered the trustees to sign consists of 10 parcels ranging in size from 3 acres to 6.81 acres and that the 29.8 acres to be released are not delineated; 2) that the preparation of an easement to protect the remaining acreage from being landlocked has not been accomplished; and 3) that the chancellor did not address himself to the question of the payment of taxes on the property to be released from the deed of trust, as appellants' brief validly complains.

Here, too, the proper course to follow has been shown by the *Leisure* case. There, the Court noted that the mortgagor had agreed to submit its choice of the acreage to be released for approval by the trial court. Judge Digges then stated:

> "... *Therefore, to effectuate this restricted right, the order of ratification of the entire 154 acres must be vacated, and on remand, upon submission by the mortgagor of its request, the chancellor should determine whether the selection is equitable under the circumstances of this case.* If it concludes that the choice is reasonable, the court should order those forty acres released from the mortgage lien, and thereupon enter an order ratifying sale of the remaining 114 acres to the appellee." (Emphasis added.)

*Id.* at 232, 372 A.2d at 603.

While there is not present in the instant appeal a similar

offer for the submission of the selected acreage for approval by the trial court, we nevertheless believe that such approval is appropriate and within the inherent jurisdiction of the court, as a court of equity; [21] and that it is also within the court's jurisdiction to determine the reasonableness of the protective easement to be prepared for the remainder of the property and to resolve the dispute concerning unpaid taxes and to determine the effect, if any, of the release of the 29.8 acres on the first deed of trust.

We therefore conclude that the order of ratification must be vacated and that upon remand the chancellor should conduct further proceedings to determine equitable solutions to the issues which remain.

> *Orders of the Circuit Court for Prince George's County in Equity E-4548 and Equity E-4618 vacated; cause remanded for further proceedings in accordance with this opinion; costs to be paid by appellants.*

---

21. Equitable considerations require that the selection of acreage to be released be guided by the good faith conduct of the parties. Even the broadest powers of selection are limited by countervailing interests of fairness and justice. *See, e.g.,* Wolf v. Oldenburg, 154 Md. 353, 358, 140 A. 494, 496 (1928) (clause permitting selection of one acre lots to be released does not permit selection of non-contiguous parcels adding up to one acre). The test to be applied by the chancellor in reviewing the selection is one of reasonableness under all of the circumstances presented herein. Leisure Campground v. Leisure Estates, 280 Md. 220, 230, 373 A.2d 595, 603 (1977).