**UNITED STATES of America**

v.

**MARYLAND BANK & TRUST COMPANY.**

**Civ. A. No. N–84–4026.**

United States District Court, D. Maryland.

April 9, 1986.

F. Henry Habicht II, Asst. Atty. Gen., Land & Natural Resources Div., Washington, D.C., Breckinridge L. Willcox, and Glenda G. Gordon, Office of the U.S. Atty. for the D. Md., Ellen M. Mahan, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff U.S.; Judith A. Dorsey, U.S. Environmental Protection Agency, Philadelphia, Pa., of counsel.

Walter W. Sawyer, of Sawyer & Myerberg, Lexington Park, Md., for defendant Maryland Bank & Trust Co.

NORTHROP, Senior District Judge.

This case presents the novel question of whether a bank, which formerly held a mortgage on a parcel of land, later purchased the land at a foreclosure sale and continues to own it, must reimburse the United States for the cost of cleaning up hazardous wastes on the land, when those wastes were dumped prior to the bank's purchase of the property.

The United States instituted this action pursuant to section 107 of the Comprehen-

sive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607 (1983), to recover the expenses incurred by the United States Environmental Protection Agency ("EPA") for removal of hazardous wastes from the toxic dump site known as the McLeod property or the California Maryland Drum site, located near the town of California in St. Mary's County, Maryland. Named as defendant in this suit is the Maryland Bank & Trust Company ("MB & T"), the owner of the property since May, 1982, and before that, the mortgagee of the tract beginning in December, 1980.[1]

Pending before the Court are defendant Maryland Bank & Trust Co.'s motion for summary judgment and plaintiff United States' motion for partial summary judgment on the issue of liability.

## FACTS

From July 7, 1944 to December 16, 1980, Herschel McLeod, Sr. and Nellie McLeod owned the piece of property now the subject of this litigation, a 117 acre farm located near the town of California, Maryland in St. Mary's County. The parties have dubbed this property the California Maryland Drum site or "CMD site".

During the period of the McLeod's ownership, the McLeods engaged in a business relationship with Maryland Bank & Trust Co., the contours of which are disputed by the parties. It is undisputed, however, that during the 1970's, MB & T loaned money to Herschel McLeod, Sr. for two of his businesses—Greater St. Mary's Disposal, Inc. and Waldorf Sanitation of St. Mary's, Inc. The bank knew that McLeod operated a trash and garbage business on the site, but the record does not state at what point the bank became aware of this.

During 1972 or 1973, McLeod permitted the dumping of hazardous wastes on the CMD site. The wastes included organics such as toluene, ethylbenzene and total xylenes and heavy metals such as lead, chromium, mercury, and zinc.

In 1980, Mark Wayne McLeod applied for a $335,000 loan from MB & T to purchase the CMD site from his parents. On or about September 2nd of that year, MB & T sent Farmers Home Administration a request for loan guarantees relating to the McLeod loan, pursuant to 7 C.F.R. §§ 1980.101 et seq. (1980) (Subpart B—Farmer Program Loans). FmHA issued Loan Note Guarantees for 90% of the loan on January 2, 1981.

Mark Wayne McLeod purchased the CMD site on December 16, 1980 through the MB & T loan, but soon failed to make payments on the loan. Consequently, MB & T instituted a foreclosure action against the CMD site in 1981 and purchased the property at the foreclosure sale on May 15, 1982 with a bid of $381,500. MB & T then took title to the property. From that date to the present, MB & T has been the record owner of the CMD site. FmHA continues to be a 90% guarantor of that loan.

On June 20, 1983, Mark Wayne McLeod informed Walter E. Raum, Director of Environmental Hygiene for St. Mary's County Department of Health, of the existence of the dumped wastes on the CMD site. After inspecting the site the following day, the State of Maryland contacted the EPA. Tests were conducted to identify the substances. On the basis of the test results, the EPA requested and received funding to conduct a removal action under CERCLA. The agency notified MB & T president John T. Daugherty that MB & T would be given until October 24, 1983 to initiate corrective action at the site or EPA would use its funds to clean-up the wastes. The bank declined the EPA's offer, so the agency proceeded to clean the site itself, removing two hundred thirty-seven drums of chemi-

---

1. Both parties subsequently filed counterclaims. The bank filed a counterclaim against the Farmers Home Administration ("FmHA"), a federal agency, asserting that the agency is liable for any costs assessed against the bank for the clean-up of the site. The United States filed a counterclaim alleging misrepresentation on the part of Maryland Bank & Trust in securing loan guarantees from FmHA. On March 5, 1986, the parties jointly moved the Court to dismiss their respective counterclaims with prejudice. The Court so ordered on March 12, 1986.

cal material and 1180 tons of contaminated soil at a cost of approximately $551,713.50. After completing the clean-up, the EPA sent a letter to MB & T President Daugherty summarizing the costs incurred in the response action and demanding payment. To date, MB & T has not tendered payment. This action ensued.

## CERCLA

Congress enacted CERCLA in 1980 in response to the environmental and public health hazards posed by improper disposal of hazardous wastes. S.Rep. No. 848, 96th Cong., 2d Sess. 2 (1980), U.S.Code Cong. & Admin.News 1980, p. 6119, *reprinted in* A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Vol. 1 at 305 (1983) (hereinafter "CERCLA Legislative History"). CERCLA empowers the federal government to clean-up and otherwise respond to hazardous dump sites. The EPA has been delegated primary responsibility for this task. Executive Order No. 12316, § 2, 3 C.F.R. 168 (1982).

"Response" actions undertaken by the EPA are financed primarily from the Hazardous Substance Response Trust Fund, commonly known as the "Super Fund", established by section 221 of CERCLA, 42 U.S.C. § 9631. The Act also authorizes the government to recover costs from certain "responsible parties". Section 107, 42 U.S.C. § 9607. This section extends liability to four categories of persons: 1) current owners and operators of the hazardous substance facility; 2) past owners or operators of the hazardous substance facility at the time of disposal; 3) persons who arranged for treatment or disposal of hazardous substances at the facility; and 4) persons who transported hazardous substances for treatment or disposal at the facility selected by them.

To establish liability under section 107(a) of the Act, the government must establish the following:

1) The site is a "facility";

2) A "release" or "threatened release" of any "hazardous substance" from the site has occurred;

3) The release or threatened release has caused the United States to incur "response costs"; and

4) The defendant is one of the persons designated as a party liable for costs.

Section 107 imposes strict liability, *see* S.Rep. No. 848, 96th Cong., 2d Sess. 34 (1980), *reprinted in* 1 CERCLA Legislative History at 308, 341; *J.V. Peters & Co., Inc. v. Administrator, E.P.A.*, 767 F.2d 263, 266 (6th Cir.1985); *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042 (2d Cir.1985), and without regard for causation, *Shore Realty*, 759 F.2d at 1044.

## DISCUSSION

Defendant Maryland Bank & Trust does not dispute the fact that the first three elements of the prima facie case under section 107(a) have been met by the United States. *See* Amended Response to Requests for Admission, Responses Number 37 (facility), 36 (release or threatened release) and 38 (costs incurred by the United States). The question central to both the defendant's and the plaintiff's motions for summary judgment concerns the final element, specifically, whether Maryland Bank & Trust is an "owner and operator" within the meaning of sections 107(a)(1) and 101(20)(A).

Additionally, Maryland Bank & Trust has raised in its answer an affirmative defense based upon section 107(b)(3), the so-called "third party defense". The United States argues in its motion for partial summary judgment that the bank cannot meet its burden of proof on that defense, an assertion disputed by the defendant in its opposition memorandum.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall issue when the record before the court establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The movant bears the

burden "to demonstrate clearly that there is no genuine issue of fact, any doubt as to the existence of such an issue is resolved against him." *Phoenix Savings & Loan v. Aetna Casualty and Surety Co.*, 381 F.2d 245 (4th Cir.1967). When, however, there is no genuine issue of material fact, the existence of an important, difficult or complicated question of law is not a bar to summary judgment. *Carroll v. United Steelworkers of America*, 498 F.Supp. 976 (D.Md.), *aff'd mem.*, 639 F.2d 778 (4th Cir. 1980).

### I. Liability of Current Owners under CERCLA

Section 107(a) of CERCLA provides:

(a) Covered persons; scope

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, or hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

The United States relies upon subsection (1) in its effort to pin liability on MB & T, the current owner of the CMD site. MB & T, for its part, argues against the imposition of liability on the basis of section 101(20)(A), the definition of "owner or operator":

"owner or operator" means ... (iii) in the case of an abandoned facility, any person who owned, operated or otherwise controlled activities at such facility immediately prior to such abandonment. *Such term does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility* ... (emphasis added).

Essentially, MB & T contends that as a former mortgagee of the property which it has purchased at a foreclosure sale, it is exempted from liability under CERCLA, even though it might be a "person who has owned, operated, or otherwise controlled activities" at the site.

A. The Court initially turns to the question of whether MB & T falls within section 107(a)(1). That section holds liable "the owner and operator" of the facility. It is undisputed that MB & T has been the owner of the facility since May, 1982. The parties dispute whether the bank has been the operator of the facility since that time. The dispute over the term "operator" is not determinative, however, for the Court holds that current ownership of a facility alone brings a party within the ambit of subsection (1). Notwithstanding the language "the owner and operator", a party need not be both an owner and operator to incur liability under this subsection.

The structure of section 107(a), like so much of this hastily patched together compromise Act, is not a model of statutory clarity. It is unclear from its face whether subsection (1) holds liable both owners and operators or only parties who are both owners and operators. This ambiguity stems in large part from the placement of the definite article "the" before the term "owner" and its omission prior to the term "operator". Proper usage dictates that the phrase "the owner and operator" include only those persons who are both owners and operators. But by no means does Congress always follow the rules of grammar when enacting the laws of this nation. In fact, to slavishly follow the laws of grammar while interpreting acts of Congress would violate sound canons of statutory interpretation. *Philbrook v. Glodgett*, 421 U.S. 707, 713–14, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975); *United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 542–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940). Misuse of the definite article is hardly surprising in a hastily conceived compromise statute such as CERCLA, since members of Congress might well have had no time to dot all the i's or cross all the t's. *See generally* Safire, *Of 'The' I Sing*, N.Y. Times, March 2, 1986, § 6 (Magazine), at 14 (As the most common word in the English language, *the* is too often taken for granted).[2]

An examination of the legislative history, sparse as it is, and the lone relevant case convinces the Court to interpret the language of subsection (1) broadly to include both owners and operators. The House Report accompanying H.R. 85, one of the four bills to coalesce into CERCLA, explains the definition of "operator" as follows: "In the case of a facility, an 'operator' is defined to be a person who is carrying out operational functions for the owner of the facility pursuant to an appropriate agreement." 1980 U.S.Code Cong. & Ad. News 6119, 6182.[3] By its very definition, an operator cannot be the same person as an owner. Therefore, a class defined as consisting of persons who are both owners and operators would contain no members. Such a definition would render section 107(a)(1) a totally useless provision.

The Court of Appeals for the Second Circuit recently held a current owner of a facility responsible for response costs under section 107(a)(1) even though that party had not owned the site at the time of the dumping and had apparently not "operated" the facility.[4] *Shore Realty*, 759 F.2d 1032 (2d Cir.1985). The court stated that "section 9607(a)(1) [107(a)(1)] unequivocably imposes strict liability on the current owner of a facility from which there is a release or a threat of release, without regard to causation." *Id.* at 1044. This Court agrees.

B. The definition of "owner or operator" contained in section 101(20)(A), 42 U.S.C. § 9601(20)(A), excludes from liability "a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the ... facility." MB & T disclaims liability on the basis of this exemption.

Relying upon a statutory exemption to a Congressionally imposed rule of general liability, MB & T has the burden of proving that it is entitled to that exemption. *See United States v. First City National Bank of Houston*, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967) (Bank Merger Act of 1966); *Federal Trade Commission v. Morton Salt Co.*, 334 U.S. 37, 44–45, 68 S.Ct. 822, 827–28, 92 L.Ed. 1196 (1948) (Robinson-Patman Act); *Securities and Exchange Commission v.*

---

**2.** The task of statutory interpretation is rendered no easier by the syntactical anomaly of subsection (1). Subsection (1) is the only subsection in section 107(a) not structured in the form "any person who ..."

**3.** Both parties have cited and relied upon the definition of owner contained in this report.

**4.** An unauthorized, and soon to be evicted tenant, had dumped some hazardous waste during Shore's tenure as owner. The court did not, however, seem to attach any significance to this fact in its determination that the defendant was liable under subsection (1).

*American International Savings and Loan Association,* 199 F.Supp. 341, 347 (D.Md.1961) (Securities Act of 1933).

■ It is undisputed that MB & T held a mortgage on the site beginning on December 16, 1980, instituted foreclosure proceedings in 1981, and purchased the property at the foreclosure sale on May 15, 1982. MB & T contends that it is entitled to the benefit of this exclusion because it acquired ownership of the CMD site through foreclosure on its security interest in the property and purchase of the land at the foreclosure sale. The government asserts that the bank is not entitled to the exemption as a matter of law. The Court finds the government's position more persuasive and holds that MB & T is not exempted from liability by the exculpatory clause of section 101(20)(A).

The exemption of subsection (20)(A) covers only those persons who, at the time of the clean-up, hold indicia of ownership to protect a then-held security interest in the land. The verb tense of the exclusionary language is critical. The security interest must exist at the time of the clean-up. The mortgage held by MB & T (the security interest) terminated at the foreclosure sale of May 15, 1982, at which time it ripened into full title. 55 Am Jur 2d Mortgages, § 785.

MB & T purchased the property at the foreclosure sale not to protect its security interest, but to protect its investment. Only during the life of the mortgage did MB & T hold indicia of ownership primarily to protect its security interest in the land. Under the law of Maryland (and twelve other states), the mortgagee-financial institution actually holds title to the property while the mortgage is in force. *See Burroughs v. Garner,* 43 Md.App. 302, 312 n. 14, 405 A.2d 301, 308 n. 14 (Md.Ct.Spec.

App.1979). *See generally* 58 C.J.S. Mortgages § 1, at 23–28. Congress intended by this exception to exclude these common law title mortgagees from the definition of "owner" since title was in their hands only by operation of the common law. The exclusion does not apply to former mortgagees currently holding title after purchasing the property at a foreclosure sale, at least when, as here, the former mortgagee has held title for nearly four years, and a full year before the EPA clean-up.[5]

A review of the legislative history and policies underlying the Act support this narrow construction. The first draft of the Comprehensive Oil Pollution Liability and Compensation Act (H.R. 85), one of the four major bills out of which CERCLA emerged, defined "owner" in section 101(4) to include an exemption similar to that in the ultimately enacted bill.

> (x) "owner" means any person holding title to, or, in the absence of title, any other indicia of ownership of a vessel or facility, *but does not include a person who, without participation in the management or operation of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility.* (emphasis added).

H.R. 85 as introduced May 15, 1979, 2 CERCLA Legislative History at 525. Accompanying H.R. 85 was House Report 96–172, Part 1. In that report, the Committee on Merchant Marine and Fisheries explains the definition of "owner" and its exclusion as follows:

> "Owner" is defined to include not only those persons who hold title to a vessel or facility but those who, in the absence of holding a title, possess some equivalent evidence of ownership. It does not include certain persons possessing indicia

---

5. Because MB & T has held the property for such an extended period of time, this Court need not consider the issue of whether a secured party which purchased the property at a foreclosure sale and then promptly resold it would be precluded from asserting the section 101(20)(A) exemption. The United States District Court for the Eastern District of Pennsylva-

nia recently held that a former mortgagee that purchased the property at a foreclosure sale and assigned it four months later was exempt from liability. *United States v. Mirabile,* 15 Envtl.L. Rep. (Envtl.L.Inst.) 20992 (E.D.Pa. Sept. 4, 1985). The case is discussed in greater detail below.

of ownership (such as a financial institution) who, without participating in the management or operation of a vessel or facility, *hold title either in order to secure a loan* or in connection with a lease financing arrangement under the appropriate banking laws, rules or regulations. (emphasis added). 2 CERCLA Legislative History at 546. This report indicates that Congress intended to protect banks that hold mortgages in jurisdictions governed by the common law of mortgages, and not all mortgagees who later acquire title.

The interpretation of section 101(20)(A) urged upon the Court by MB & T runs counter to the policies underlying CERCLA. Under the scenario put forward by the bank, the federal government alone would shoulder the cost of cleaning up the site, while the former mortgagee-turned-owner, would benefit from the clean-up by the increased value of the now unpolluted land. At the foreclosure sale, the mortgagee could acquire the property cheaply. All other prospective purchasers would be faced with potential CERCLA liability, and would shy away from the sale. Yet once the property has been cleared at the taxpayers' expense and becomes marketable, the mortgagee-turned-owner would be in a position to sell the site at a profit.

In essence, the defendant's position would convert CERCLA into an insurance scheme for financial institutions, protecting them against possible losses due to the security of loans with polluted properties. Mortgagees, however, already have the means to protect themselves, by making prudent loans.[6] Financial institutions are in a position to investigate and discover potential problems in their secured properties. For many lending institutions, such research is routine. CERCLA will not absolve them from responsibility for their mistakes of judgment.[7]

Counsel have cited two recent decisions which merit attention. The United States Bankruptcy Court for the Northern District of Ohio stated in dictum that had a bank repossessed its collateral in a toxic waste dump pursuant to its security agreement, it would have qualified for the 101(20)(A) exception, and hence escaped liability. *In re T.P. Long Chemical, Inc.*, 22 E.R.C. 1547 (Bankr.N.D.Ohio Jan. 3, 1985).

In the more significant of the two decisions, the United States District Court for the Eastern District of Pennsylvania held that a former mortgagee of a site that purchased the site at a foreclosure sale and assigned it four months later was exempt from liability under § 101(20)(A)'s exclusion. *United States v. Mirabile*, 15 Envtl. L.Rep. (Envtl.L.Inst.) 20992 (E.D.Pa. Sept. 4, 1985). The court found that the mortgagee's purchase of the land at the foreclosure was plainly undertaken in an effort to protect its security interest in the property. That holding pertained to a situation in which the mortgagee-turned-owner promptly assigned the property. To the extent to which that opinion suggests a rule of broader application, this Court respectfully disagrees. The legislative history and policies behind the Act counsel against such a generous reading of section 101(20)(A)'s exclusion.[8]

**6.** The mortgagees also have the options of not foreclosing and not bidding at the foreclosure sale. Both steps would apparently insulate the mortgagee from liability.

**7.** The third party defense under section 107(b)(3) may, however, be available for certain mortgagees-turned-owners. See Part II of this opinion.

**8.** In its motion for summary judgment, defendant MB & T characterizes itself as an "involuntary owner" of the property, compelled by the Farmers Home Administration to foreclosure and bid on the site. Defendant's Memorandum in Support of Motion for Summary Judgment at

**7.** For this reason, the defendant urges the Court to include it within the ownership exemption of section 101(20)(A). The Court declines to carve a judicially-created loophole in the statutory structure. The role of the FmHA was pertinent only to defendant MB & T's counterclaim against FmHA for any costs assessed against the bank for the clean-up, not to the question of whether the bank is an owner within the meaning of the statute. That counterclaim has been dismissed with prejudice at the request of the parties and pursuant to Fed.R. Civ.P. 41(c).

## II. The Third Party Defense Under Section 107(b)(3)

Section 107(b)(3) establishes an affirmative defense for a person otherwise liable under section 107(a), the so-called third party defense. Section 107(b)(3) provides:

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly with the defendant, ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions....

Defendant MB & T raised this defense in its answer, though it has not moved for summary judgment on this basis. The United States has asserted in its motion for summary judgment that MB & T cannot meet its burden of proof for this defense.

The government presses a two-pronged argument. First, MB & T had an established and close contractual relationship with Hershel McLeod, Sr., linked directly or indirectly to McLeod's operations, operations which resulted in the release of hazardous substances. Second, even assuming that MB & T had insufficient contractual relations with McLeod, the bank could not prove that it exercised reasonable care with respect to the substances at the site and that it took reasonable precautions at the site since it purchased the property.

■ The Court has scrutinized the evidence submitted with these motions, particularly that proffered by the plaintiff, and concludes that genuine issues of material fact exist concerning the nature of the contractual relation between MB & T and Hershel McLeod, Sr. and the reasonableness of MB & T's conduct. The Court therefore denies this part of the United States' motion for summary judgment. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Phoenix Savings and Loan, Inc. v. The Aetna Casualty & Surety Co.*, 381 F.2d 245 (4th Cir. 1967).

Though the evidence shows that during the 1970's MB & T loaned money to McLeod, Sr. for two of his businesses, Greater St. Mary's Disposal, Inc. and Waldorf Sanitation of St. Mary's, Inc., and that at least one loan to McLeod was secured with the CMD property,[9] the evidence presented does not establish the existence of any outstanding loans in 1972 or 1973, the years of the hazardous waste disposal. Furthermore, the evidence presented does not clearly demonstrate the full nature of the contractual and business relations between McLeod and MB & T. A full trial is necessary to flush out the bare facts now on the record.

■ As to the second component of the government's argument, the reasonableness of MB & T's conduct with respect to the site, important factual questions remain unresolved, precluding summary judgment. The parties dispute whether MB & T knew that the hazardous wastes were located on the property. Though bank personnel were aware of the trash dump, that dump was located some distance away from the hazardous waste site. In addition, the record fails to specify the accessibility of the toxic dump, and whether it was visible or otherwise apparent. Without this detailed information, the

---

**9.** The evidence does not, however, establish that the loan or loans secured by the CMD site were made to McLeod for business purposes.

Court cannot begin to decide whether MB & T exercised due care.[10]

In conclusion, the Court grants that part of the United States' motion for summary judgment pertaining to the issue of liability under section 107(a)(1) and denies that part of the motion concerning the third party defense under section 107(b)(3). The Court also denies Maryland Bank & Trust Co.'s motion for summary judgment.

---

**10.** The cases cited by the plaintiff under the similar standard found in the Clean Water Act do not convince the Court otherwise. In *Travelers Insurance Co. v. United States,* 2 Cl.Ct. 758 (1983), for instance, the Court of Claims deter-mined the issue of reasonableness only after a full trial, while in the *City of Pawtucket v. United States,* 546 F.2d 430, 211 Ct.Cl. 324 (Ct.Cl. 1976), summary judgment was entered because the parties agreed on the material facts.