Phillip and Brenda GUIDICE, et
al., Plaintiffs,

v.

BFG ELECTROPLATING AND
MANUFACTURING CO., INC.,
et al., Defendants.

Civ. A. No. 86–2093.

United States District Court,
W.D. Pennsylvania.

Sept. 1, 1989.

Richard D. Fox, Philadelphia, Pa., Ronald Simon, Washington, D.C., and Edward Specter, Pittsburgh, Pa., for Phillip and Brenda Guidice, et al.

J.W. Montgomery, III, Pittsburgh, Pa., for Season–All and Jeffy Grube.

Richard J. Federowicz, Pittsburgh, Pa., for BFG.

Eric A. Schaffer and Bradley S. Tupi, Pittsburgh, Pa., for National Bank of the Commonwealth.

Charles Kirshner, Pittsburgh, Pa., for Berlin Metals.

## MEMORANDUM AND ORDER

McCUNE, Senior District Judge.

We consider the National Bank of the Commonwealth's motion for summary judgment. We have jurisdiction pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331. For reasons set forth below the motion will be denied.

### I. PROCEDURAL HISTORY

The procedural history of this action is somewhat complicated as it has journeyed through two district court judges and now rests in the hands of a third.

In October 1986, residents of the Borough of Punxsutawney, Pennsylvania (Borough) commenced action against BFG Electroplating and Manufacturing Company (BFG). Plaintiffs alleged that BFG unlawfully contaminated the environment causing personal injuries. Also asserted by plaintiffs are claims for "response costs" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601, *et seq.*

BFG then filed a third-party complaint against current and past owners of adjacent land known as the "Berlin Property" in December 1986. BFG sought indemnification, contribution and response costs from those owners including the National Bank of the Commonwealth (Bank) as an eight-month record title owner of the Berlin Property.

On February 25, 1987, the Bank filed a motion to dismiss the third-party complaint. Plaintiffs filed a Rule 14 claim against the Bank and other third-party defendants on August 8, 1988. On September 24, 1987, Judge Dumbauld granted the Bank's mo-

tion and later denied BFG's motion for reconsideration in an order dated October 26, 1987.

On October 5, 1987, in response to an October 1987 written request of the Bank, Judge Dumbauld dismissed plaintiffs' Rule 14 claim. The October 5th order was not served on the parties. Plaintiffs responded to the Bank's letter by requesting that a proper motion be made by the Bank and plaintiffs be afforded an opportunity to respond. The Bank, also unaware of the October 5th order, filed a motion to dismiss plaintiffs' Rule 14 claim against the Bank on November 20, 1987. Three days later Judge Dumbauld issued a second order dismissing the claim with prejudice.

The case was reassigned to Judge Simmons in December, 1987.

In early 1988, BFG and plaintiffs filed motions to vacate the order dismissing the Rule 14 claim against the Bank. Additionally BFG moved to strike the orders dismissing its third-party complaint and motion for reconsideration. The Bank made a Rule 54(b) motion for findings regarding dismissal of the aforementioned Rule 14 claim and third-party complaint. At a March 26, 1988 hearing Judge Simmons orally vacated those portions of Judge Dumbauld's orders concerning plaintiffs' Rule 14 claim against the Bank on due process grounds. (Tr. pp. 2–7).

In late September 1988 the case was reassigned to the undersigned.

The Bank filed its motion for summary judgment in April 1989. Opposing briefs were filed by plaintiffs and BFG. The Bank filed reply briefs.

## II. FACTS

### A. HISTORY OF BANK'S RELATION WITH BERLIN METAL AND BANK'S OWNERSHIP OF THE BERLIN PROPERTY

During the 1970's Berlin Metal Polishers (Berlin Metal) operated a metal polishing company at the Berlin Property. Berlin Metal was managed and owned by the Runco family (Runcos).

In May 1971 the Bank approved a line of credit for Berlin Metal secured by assignment of accounts receivable. Several extensions and renewals of this line of credit were approved by the Bank from May 1971 through September 1975.

On September 8, 1975, the Bank approved a loan to construct a new treatment facility to satisfy Pennsylvania Department of Environmental Resources (PaDER) requirements secured by a mortgage on the Berlin Property. Subsequently the Bank approved additional lines of credit and two two-year installment loans. During the course of the loans and lines of credit the Bank received periodic financial statements.

By 1980, Berlin Metal had defaulted on its obligations to the Bank. In January 1980 Bank representatives toured Berlin Metal and met with plant officials to discuss management. At that meeting the Bank representatives were informed of the number of work shifts, the status of Berlin Metal's accounts, the composition of the management and the presence of raw materials. The Bank proposed and the plant management agreed that Berlin Metal take out a loan guaranteed by the Small Business Administration (SBA) to pay off monies owed the Bank on the mortgage and lines of credit. The loan was also to allow for working capital.

In March 1980, on behalf of Berlin Metal, the Bank submitted with recommendation of approval the loan application to the SBA.

On April 9, 1980, the Bank confessed judgment against Berlin in the amount of $164,000.

Through the efforts of Dominic Runco, Sr. the Bank was apprised of potential purchasers of the Berlin equipment and/or the Berlin facility as early as June 1980. However, those efforts did not come to fruition in part because Berlin could not obtain a permanent permit to use the Borough sewer.

In response to the Bank's July 1980 inquiry, the PaDER sent information concerning a May 1979 fish kill in Mahoning Creek which was attributed to a cyanide discharge from the Borough sewage treat-

ment plant. Samples taken at the Berlin and BFG facilities showed cyanide and heavy metal discharge in excess of Borough Ordinance limits.

According to Bank file memoranda, Bank credit officer Barbara Kay was in direct contact with prospective purchaser Bruce Armstrong. Armstrong advised Kay of his efforts to obtain approval from PaDER of his proposal to dump directly into the creek. Kay independently communicated with Borough officials as to the status of the Borough's acceptance of Berlin discharge. She learned that any new owner of the Berlin facility would have to apply directly to the PaDER for approval to dump into the creek. In the meantime, Berlin was permitted to use the sewer service with monitoring of its discharge commencing January 1981.

In January 1981 the Runcos requested a meeting with the Bank to discuss the future of Berlin Metal. At that meeting Dominic Runco, Sr. expressed an interest in repurchasing the business from his family, but was concerned about the outstanding debt against the business and property. Possible liquidation of the business was also discussed.

In February 1981 an agent of the Bank visited the Berlin facility with Anthony Runco. In a written report the agent noted that no one was working and there was no heat or light. Water dripped from the ceiling. He observed 35 drums of chemicals and large tanks, some containing acid, which appeared rusty.

A March 1981 Bank memorandum summarized the outstanding debt of Berlin Metal. Because the account was six months delinquent and the business closed, it was recommended that the Bank execute on the April 9, 1980 judgment. On June 3, 1981, the Bank filed a complaint and mortgage foreclosure against the Berlin facility and received judgment on June 22, 1981.

On July 13, 1981, Bank president James Trimarchi suggested a meeting to discuss settlement of Berlin's outstanding loans with the Bank.

On September 28, 1981, at the Bank's request a meeting was held with Bank officials, the Runcos and counsel for Berlin in an effort to reach a settlement.

A series of settlement proposals beginning October 1981 culminated in a written agreement between the Bank and Runcos dated January 21, 1982. The agreement contemplated a foreclosure sale of the Berlin Property with the possibility that if Colomba Runco, the ex-wife of Dominic Runco, Sr., were the successful purchaser, the Bank would provide financing.

At the sheriff's sale on April 16, 1982, the Bank purchased the Berlin Property for $145,000. The deed to the Berlin Property was delivered to the Bank May 14, 1982.

During the Bank's ownership the Bank paid insurance premiums and property taxes for the Berlin property.

Pursuant to a trust created by Colomba and Anthony Runco, trustee Russell D'Aiello was directed to acquire title to the Berlin Property. D'Aiello was further directed to rent the premises, make mortgage payments to the Bank out of the rent proceeds, and distribute any surplus proceeds to Mrs. Runco and Anthony Runco. The Bank conveyed the property to D'Aiello as trustee on January 21, 1983. The Bank informed Season–All, a tenant, in February 1983 that pursuant of the purchase financing, the lease checks were to be submitted directly to the Bank.

B. SEASON–ALL'S INVOLVEMENT WITH THE BERLIN PROPERTY AND THE BANK

In July 1981 Bank president James Trimarchi was approached at a social gathering by a representative of Season–All who expressed an interest in leasing the Berlin Property. To this end on July 13, 1981, Trimarchi forwarded a lease submitted by Season–All for the rental of a portion of the Berlin building to counsel for Berlin. Trimarchi advised Berlin that if it wished to execute the lease, it should contact Steve Garland of Season–All.

The lease between Berlin Metal and Season–All was executed on August 27, 1981. Season–All used the space for housing raw materials used in its window manufacturing operation. When Season–All took pos-

session of a portion of the Berlin Property, the entire property was vacant.

. On December 17, 1981, Season–All and Berlin executed a second lease involving the entire Berlin premises. Season–All wanted to use the additional space for the manufacture of casement windows. In March or April of 1982 Season–All took possession of the entire Berlin premises.

Initially Season–All paid its rent to Dominic Runco, Sr. In December 1981 the parties agreed that Season–All would remit its rental payments directly to the Bank to be credited to the outstanding debt of Berlin Metal.

By January 1982 Season–All was aware that the Bank was considering foreclosure on the Berlin Property. Season–All asked the Bank to assure that it would honor Season–All's lease with Berlin if the Bank acquired title at the foreclosure sale. Accordingly, on February 3, 1982, the Bank and Season–All entered into an agreement which provided that the Bank would subordinate its lien on the Berlin Property to the leasehold interest of Season–All.

## C. REMOVAL OF CHEMICAL DRUMS FROM THE BERLIN PROPERTY

When Season–All took possession of the entire Berlin premises in the spring of 1982, there were several drums of chemicals present in the Berlin building left by Berlin Metal. Donald Jeffries of Season–All contacted Dominic Runco, Sr., making several requests that he remove the leftover materials. Runco said he was contacting someone to remove the materials, but he never did so.

Prior to the Bank's foreclosure, Season–All informed the Bank that it would withhold rent if the drums were not removed.

On April 22, 1982, a representative of the PaDER visited the Berlin Property, inventoried the drums of leftover materials from Berlin Metal, and declared some of them to be hazardous wastes. The PaDER sent the Bank and Season–All the results of the inventory by letters dated April 23, 1982. The PaDER requested the Bank to contract with a hazardous waste transporter and a hazardous waste disposal facility. Jeffries

testified that although several of the drums were in poor condition and some had open tops, they were not leaking.

Within a week or two, Dominic Runco, Jr. removed 12 to 15 containers approved for his removal and use by the PaDER.

The Bank agreed to provide Berlin Metals with financing for the purpose of enabling Berlin to have the drums removed. The removal cost was to be added to the principal of the Runco's debt to the Bank upon their planned repurchase of the property.

At the Bank's request, Jeffries contacted Ecology Chemical and Refining Company to remove the waste from the Berlin Property. Ecology removed 26 drums on September 15–16, 1982. The transportation manifests signed by Anthony Runco identify Berlin Metal as the generator.

On September 21, 1982, Ecology invoiced Berlin for the removal costs of approximately $20,000. In January 1983, an Ecology letter looked to the Bank for the reimbursement. The Runcos paid half of the bill while the Bank paid the other half as part of the settlement of the Berlin debt.

## III. DISCUSSION

■ As a preliminary matter the Bank argues that the doctrine of the law of the case applies and that we are therefore precluded from reconsidering orders dismissing plaintiffs' claims. However, it is clear from the transcript of the March 26, 1988 hearing before Judge Simmons that those portions of Judge Dumbauld's orders concerning dismissal of plaintiffs' rule 14 claim against the Bank were vacated. Therefore, the doctrine does not have application now. Judge Simmons has already disregarded Judge Dumbauld's order as to the Rule 14 complaint at least.

■ The Bank also argues that BFG lacks standing to oppose this motion because Judge Dumbaulf dismissed BFG's third-party complaint on September 24, 1987 and denied reconsideration in an order dated October 26, 1987. BFG filed a motion to strike the aforementioned orders on

January 19, 1988. We retain the authority to revise the orders.

Under Rule 56 of the Federal Rules of Civil Procedure the moving party is entitled to judgment as a matter of law if the movant demonstrates that there is no genuine issue of material fact. Summary judgment is proper "[w]here the record as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). To sustain a motion for summary judgment we must resolve all inferences from the underlying facts in the light most favorable to the non-moving party. *Id.*

In order for the Bank to succeed in its motion for summary judgment, the Bank must establish that it has no liability under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, (CERCLA), Pub.L. No. 96–510, 94 Stat. 2767 (1980), codified in part as amended at 42 U.S.C. §§ 9601–9675 (West 1983 and Supp.1989).

■ CERCLA imposes liability on four classes of potentially responsible parties: (1) current owners or operators of hazardous waste sites; (2) those persons who owned or operated the site at the time of disposal; (3) hazardous waste generators who arranged for disposal or treatment of their waste at the site; and (4) transporters of the hazardous waste to a site from which there is a release or threatened release. 42 U.S.C. § 9607(a). These persons are potentially liable for the costs incurred as a result of "a release, or a threatened release ... of a hazardous substance" from the facility. *Id.* The party does not need to be both an owner and an operator to be liable under CERCLA. *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1280 (D.Del.1987), *affirmed*, 851 F.2d 643 (3d Cir.1988).

The parties agree that the main issue is whether the Bank is a potentially responsible defendant as a former owner or operator of the Berlin Property when there was a disposal of hazardous wastes. There are two time frames in which we must consider whether the Bank was an "owner or operator" of the Berlin Property: the period prior to the Bank's foreclosure and purchase of the Berlin Property and the period of the Bank's ownership.

## A. LIABILITY OF THE BANK PRIOR TO ITS PURCHASE OF THE BERLIN PROPERTY

■ Congress provided an exception to liability as an "owner or operator" of a hazardous site for "a person who, without participating in the management of a ... facility, holds indicia of ownership primarily to protect his security interest in the ... facility." 42 U.A.C. § 9601(20)(A) (West Supp.1989). Under Pennsylvania law, the holding of a mortgage constitutes an indicia of ownership. *See Reconstruction Finance Corporation v. Northern Trust Co.*, 98 F.2d 555, 556 (3d Cir.1938).

■ The existing case law suggests that, prior to foreclosure, a mortgagee is exempt from CERCLA liability under 42 U.S.C. § 9601(20)(A) so long as the mortgagee did not participate in the managerial and operational aspects of the facility. *United States v. Mirabile*, 15 Envtl.L.Rep. (Envtl. L.Inst.) 20992, 20995, 1985 WL 97 (E.D.Pa. Sept. 4, 1985); *United States v. Fleet Factors Corp.*, 724 F.Supp. 955 at 960 (S.D. Ga.1988); *United States v. Nicolet, Inc.*, 712 F.Supp. 1193 at 1204 (E.D.Pa.1989).

Interpretation of "participating in the management" and "primarily to protect is security interest" has permitted secured creditors "to provide financial assistance and general, and even isolated instances of specific management advice to its debtors without risking CERCLA liability if the secured creditor does not participate in the day-to-day management of the business or facility either before or after the business ceases operation." *United States v. Fleet Factors Corp.*, 724 F.Supp. 955; *see also, United States v. Mirabile.* The question we address is whether the Bank had passed the point of protecting its security interest and was participating in the management or control of Berlin Metals.

The Bank held a mortgage on the Berlin Property between October 1975 and April

16, 1982, the date of foreclosure. Several additional loans and lines of credit secured by additional mortgages on the Berlin facility or the accounts receivable by Berlin Metals were issued by the Bank during that period. The Bank received periodic financial statements.

After Berlin Metal defaulted on its loan obligations, the Bank took steps to protect its interest in the Berlin Property. These steps included a January 1980 meeting with Berlin officials where the Bank was informed of such things as the status of Berlin accounts, personnel changes and the presence of raw materials. Bank officials met with Berlin officials and actively assisted Berlin in its application for a loan from the SBA. Communications with the PaDER and Borough officials were initiated by the Bank in 1980 in an effort to assist Berlin with wastewater discharge compliance.

After operations at the Berlin Property ceased in early 1981, a Bank agent visited the property and reported the results of his inspection to the Bank. A series of meetings transpired between the Bank and Runcos concerning the restructuring of Berlin Metals' loans. The Bank referred a potential lessee, Season–All, to the attorney representing the Runcos.

In January 1982 the Bank and Runcos arrived at an agreement whereby the Bank would provide financing if Colomba Runco were the purchaser at a subsequent foreclosure sale.

We regard these activities prior to foreclosure insufficient to void the security interest exemption of CERCLA. There is no evidence suggesting that the Bank controlled operational, production, or waste disposal activities at the Berlin Property. *See e.g., Idaho v. Bunker Hill Co.*, 635 F.Supp. 665, 672 (D.Idaho 1986) (Corporate parent with capacity and reserved authority to make decisions and implement actions and mechanisms to prevent and abate damage caused by disposal and releases of hazardous wastes of its subsidiary found liable under CERCLA.) The actions of the Bank prior to its purchase of the Berlin Property at the foreclosure sale were prudent measures undertaken to protect its security interest in the property.

There are policy reasons for exemption of secured creditors in the Bank's position from CERCLA liability prior to the secured creditor's purchase of the property at foreclosure. A goal of CERCLA is safe handling and disposal of hazardous waste. To encourage banks to monitor a debtor's use of security property, a high liability threshold will enhance the dual purposes of protection of the banks' investments and promoting CERCLA's policy goals. Conversely, a low liability standard would encourage a lender to terminate its association with a financially troubled debtor and expedite loan payments in an effort to recover the debts.[1]

## B. LIABILITY OF THE BANK AFTER ITS PURCHASE OF THE BERLIN PROPERTY

■ There is a divergence in case law as to whether the security interest exemption is applicable when a secured creditor purchases its security interest at a foreclosure sale. The two principal decisions, *United States v. Mirabile*, 15 Envtl.L.Rep. (Envtl. L.Inst.) 20992 (E.D.Pa. Sept. 4, 1985) and *United States v. Maryland Bank & Trust Co.*, 632 F.Supp. 573 (D.Md.1986), approach the issue of lender liability from different directions.

The focus in *Mirabile* was whether a lender is precluded from invoking the security interest exemption rather than whether the exemption applies in the first place. There, one of the secured creditors, American Bank, foreclosed on and took title to a defunct business that had created a hazardous waste. Four months later American Bank sold the site to the Mirabiles. When the EPA sued the Mirabiles to

---

1. *See generally,* Tom, *Interpreting the Meaning of Lender Management Participation Under Section 101(20)(A) of CERCLA,* 98 Yale L.J. 925 (1989); Note, *The Liability of Financial Institutions for Hazardous Waste Cleanup Costs Under CERCLA,* 139 Wis.L.Rev. 139 (1988); Note, *When a Security Becomes a Liability: Claims Against Lenders in Hazardous Waste Cleanup,* 38 Hastings L.J. 1261 (1987).

recover its clean-up costs, the Mirabiles joined American Bank as a third-party defendant. During its four-month ownership American Bank took steps to secure the property, showed the property to prospective purchasers, and made inquiries as to the removal of the drums of hazardous waste.

The *Mirabile* court found that regardless of the nature of title American Bank received, the actions after foreclosure were undertaken merely to protect its security interest in the property and did not constitute an attempt to participate in the management of the site. *Mirabile*, 15 Envtl.L.Rep. at 20,996. Thus, exemption from CERCLA liability applied as long as a lender limited its activities to the financial aspects of management and did not become too embroiled in the "nuts-and-bolts, day-to-day production aspects of the business". *Id.* at 20,995. Foreclosure and repurchase were natural consequences in protection of a security interest.

The *Maryland Bank & Trust* court held that when a mortgagee becomes an owner of the property, the security interest exemption is lost. There, Maryland Bank foreclosed on the mortgage, took title and had owned the property for nearly four years when the EPA sued for recovery costs. Through examination of the statutory language of 42 U.S.C. § 9601(20)(A) the court determined that the use of the present tense indicated the security interest must exist at the time of clean-up. *Maryland Bank & Trust*, 632 F.Supp. at 579.

The court reasoned that the purpose of the security exemption was to protect secured lenders in common law states where the mortgagee holds legal title to the mortgaged realty until satisfaction of the underlying loan obligation. *Id.* Furthermore, the court found that exemption of Maryland Bank would contradict the policies underlying CERCLA. If Maryland Bank were exempted from liability, the federal government would shoulder the clean-up costs while the bank would enjoy a windfall by the increased value of the improved land and a possible sale at a profit. *Id.* at 580.

Extending the interest exemption to lenders holding full title to properties would frustrate the distribution of clean-up costs achieved by CERCLA as well as reallocate the risks assumed in owning real property. *Id.*

The 1986 amendments to CERCLA lend support to the narrow reading of the security interest exemption in *Maryland Bank & Trust*. State and local governments acquiring "ownership or control involuntarily through bankruptcy, tax delinquency, abandonment" or similar means were excluded from liability as owners or operators. 42 U.S.C. § 9601(20)(D) (West Supp.1989). "Any person who owned, operated, or otherwise controlled activities at [the] facility immediately beforehand" are held liable. 42 U.S.C. § 9601(20)(D) (West Supp.1989). That Congress did not simultaneously amend the statute to exclude from liability lenders who acquire property through foreclosure might indicate that Congress intended to hold them liable as owners. *See* Tom, *Interpreting the Meaning of Lender Management Participation Under Section 101(20)(A) of CERCLA*, 98 Yale L.J. 925, 926 (1989).

We find the concern expressed in *Maryland Bank & Trust*, that an exemption for landowning lenders would create a special class of otherwise liable landowners, and the failure of the 1986 amendments to specifically exempt mortgagees-turned-landowners persuasive. When a lender is the successful purchaser at a foreclosure sale, the lender should be liable to the same extent as any other bidder at the sale would have been.

In the instant action we find that the security interest exemption of 42 U.S.C. § 9601(20)(A) does not apply for the period the Bank was record owner of the Berlin Property. During that period the Bank was a potentially responsible party as defined in 42 U.S.C. § 9607(a)(2).

C. THE EXISTENCE OF A DISPOSAL OF HAZARDOUS WASTE DURING THE BANK'S OWNERSHIP OF THE BERLIN PROPERTY

Rule 56(c) of the Federal Rules of Civil Procedure mandates that the non-

moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). As part of its prima facie case, a claimant must demonstrate that a release or threatened release of hazardous substances from the site has occurred. *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. at 1278; *Maryland Bank & Trust Co.,* 632 F.Supp. at 576. A former owner or operator is liable under CERCLA only if hazardous wastes were disposed of during the time that person owned or operated the site. 42 U.S.C. § 9607(a)(2); *Cadillac Fair View/Cal., Inc. v. Dow Chem. Co.,* 21 Env't Rep.Cas. (BNA) 1108, 1113 (C.D.Cal. Mar. 5, 1984). The Bank maintains that BFG and plaintiffs have failed to meet their burdens of proof in this regard.

■ The terms "release" and "disposal" have broad definitions. Although the definitions are not synonumous, leakage of hazardous waste into the environment is a common element.[2] It is important to recognize that "disposal" is not limited to a one-time occurrence. "[T]here may be other disposals when hazardous materials are moved, dispersed, or released during landfill excavations and fillings." *Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1573 (5th Cir.1988).

That the Bank was aware that drums containing hazardous material were on the Berlin Property during its ownership is not in dispute. Also, testimony corroborates that some of the drums of hazardous waste were personally observed to be without tops and in a rusted condition. Water dripped from the ceiling and the floor was cracked. Any liquid accumulating on the floors was swept into the alleys surrounding the Berlin Property by Season–All employees.

We find that plaintiffs and BFG have made a sufficient showing of a release and disposal of hazardous waste at the Berlin Property during the Bank's ownership to escape summary judgment.

### D. COMMON LAW CLAIMS OF PLAINTIFFS AND BFG

We reserve judgment on the merits of the common law and state law claims of plaintiffs and BFG. However, to the extent those theories of liability "derive from a common nucleus of operative fact" and "would ordinarily be expected to [be tried] ... in one judicial proceeding," we retain pendent jurisdiction to hear those claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

An order follows.

### ORDER

AND NOW, Sept. 1, 1989, the orders of September 24, 1978 and October 26, 1987, are vacated. Defendant BFG Electroplating and Manufacturing may proceed with its cause of action against third-party defendant, National Bank of the Commonwealth, under CERCLA as a former "owner or operator" for the period the Bank had record title to the Berlin Property.

Plaintiffs may proceed with their Rule 14 claim against the Bank under CERCLA as a former "owner or operator" for the period the Bank had record title to the Berlin Property.

We reserve judgment on the merits of the common law and state law claims.

The motion for summary judgment by the National Bank of the Commonwealth is denied.

---

**2.** A "release" includes "any spilling, *leaking,* pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment." 42 U.S.C. § 9601(22) (emphasis added).

"Disposal" is defined to include "a discharge, deposit, injection, dumping, spilling, leaking, or placing of any ... hazardous waste into or on any land or water so that such ... hazardous waste ... may enter the environment or be emitted into the air or discharged in any waters, including ground water." 42 U.S.C. § 6903(3) (emphasis added).

## MEMORANDUM AND ORDER

Reference is made to our opinion of September 1, 1989, wherein the National Bank of the Commonwealth's motion for summary judgment was denied.

We now consider the National Bank of the Commonwealth's motion for reconsideration.

The facts of this case are set forth in detail in our September opinion. Briefly, the Bank, as a mortgagee and eight-month record owner of the Berlin Property, raised the security interest exemption of CERCLA, 42 U.S.C. § 9601(2)(A), to preclude it from potential CERCLA liability under 42 U.S.C. § 9607(a). We held that the security interest exemption did not apply to the period the Bank had record title to the Berlin Property in this case. During that period the Bank was a potentially responsible party as defined in 42 U.S.C. § 9607(a)(2).

Under 42 U.S.C. § 9607(a)(2), a former owner is liable only if hazardous wastes were disposed of during the tenure of ownership. We found that plaintiffs and BFG had raised questions of fact concerning a release and disposal of hazardous waste at the Berlin Property during the Bank's ownership sufficient to preclude summary judgment. Of course, it is a claimant's burden of proof to demonstrate a release and disposal at trial.

We have reviewed the briefs filed by the Bank, plaintiffs and BFG. No new matter has been raised. Accordingly, the motion for reconsideration is denied.