608 A.2d 1082

FIRST CAPITAL LIFE INSURANCE COMPANY, Appellee,

v.

SCHNEIDER, INC., Appellant.

Superior Court of Pennsylvania.

Argued Jan. 14, 1992.

Filed May 15, 1992.

Petition for Allowance of Appeal Denied Sept. 29, 1992.

Anthony M. Mariani, Pittsburgh, for appellant.

Ronald G. Backer, Pittsburgh, for appellee.

Before CAVANAUGH, WIEAND and HESTER, JJ.

WIEAND, Judge:

In this action in equity, the trial court entered a final decree enjoining a mortgagor in default from interfering with the mortgagee's entering upon the mortgaged premises to conduct environmental tests. The mortgagor appealed. After careful review, we affirm.

The case was submitted to the trial court on an agreed statement of facts which included the following. On or about August 4, 1986, First Capital Life Insurance Co. (First Capital) made a loan of seven million, three hundred thousand ($7,300,000.00) dollars to Schneider, Inc. The loan was secured by a note and mortgage on real estate located

in Scott Township, Allegheny County. Schneider failed to make full payments on the note between December, 1988, and February, 1989, and failed to make any payments after April, 1989. The unpaid principal exceeds seven million ($7,000,000.00) dollars. Schneider has also violated provisions of the note and mortgage which require that the premises remain free and clear of other liens. The defaults have not been cured despite demands therefor by First Capital.

In February, 1989, Schneider granted a request by First Capital to enter the property during normal business hours to inspect the same; and, on March 9, 1989 and again on March 15, 1989, GAI Consultants, Inc. (GAI), representing First Capital, made a surface inspection of the property to determine its environmental condition. In its report, copies of which were provided to First Capital and Schneider, GAI stated:

> Based on the prior site use and operation and current evidence of 1 and 5 gallon paint cans and 55 gallon drums of unknown material being incorporated into the fill placed on site, the potential exists for contamination of the subsurface (soil and/or ground water) at the site.

Robert J. Turka, an engineering manager, offered his conclusions as to the source of the potential contamination:

> Sipes Chemical Coating Company operated on the property from 1906 until 1973. Sipes manufactured paint and probably used numerous chemicals in its operation. There was at least one large tank used on the property and twenty small tanks holding paints and chemicals. There may therefore be toxic chemicals or other toxic materials in the ground.

> The 55 gallon drums and 5 gallon paint cans in the fill along Chartiers Creek, some containing hardened paint or other unknown materials, suggests that the practice at the facility was to dispose of waste in the fill. This was not an uncommon practice in past years.

The site is composed of fill, when Chartiers Creek was relocated, probably around 1900. Part of the creek bed still remains under the property.

There is evidence that an open disposal pit was maintained at one time on adjacent property. Due to the topography of the land and the creek bed, if chemicals were disposed of in this open pit they may be leaking onto the subject property.

GAI recommended, therefore, that a second search be made in an effort to determine the presence or absence of hazardous wastes and the extent of any contamination. This "phase two" investigation would consist of the drilling of approximately twelve (12) holes from 10 to 12 inches in diameter. In nine (9) of those holes, groundwater monitoring wells would be installed.

On June 21, 1989, First Capital requested permission for GAI to conduct the recommended intrusive search or phase two investigation and offered to pay not only for the inspection but also for any repairs or damages caused by the test. Schneider denied First Capital's request for access to the property and advised First Capital that it would deem the phase two investigation a trespass by First Capital and its representatives. According to the stipulation entered by the parties, Schneider's expert would testify that the intrusive investigation sought to be performed by First Capital was not without risks and that under current government regulations, Schneider had no obligation to conduct the proposed investigation. If substantial quantities of hazardous materials are found at the site, clean-up costs may well exceed one million ($1,000,000.00) dollars.

First Capital then filed a complaint in equity which requested the trial court to enjoin Schneider from prohibiting or obstructing entry of the mortgaged premises by representatives of First Capital for purposes of making a comprehensive environmental audit. A petition for immediate preliminary relief was also filed, and this was granted by the court on October 3, 1989. On appeal, the Superior Court determined that the trial court's order was not mere-

ly a temporary order but a final determination of the underlying controversy. Because it had been entered without a final hearing, the Superior Court reversed and remanded for further proceedings. Upon remand, the trial court heard testimony regarding the nature of the proposed tests and the risks inherent therein. At the conclusion of the hearing, however, the court again entered an order granting the requested relief. Post-trial motions were denied, and a final decree was entered. Schneider appealed. It contends that the mortgage agreement does not authorize intrusive environmental testing and that, in any event, First Capital has an adequate remedy at law in the form of an action to foreclose the mortgage.

In reviewing equity matters, an appellate court's standard of review is narrow, "for we are bound by the trial court's determinations pertaining to the credibility of the witnesses and the weight to be accorded to the evidence." *Hostetter v. Hoover*, 378 Pa.Super. 1, 6, 547 A.2d 1247, 1249 (1988).

> [A]ppellate review of equity matters is limited to a determination of whether the chancellor committed an error of law or abused his discretion. *Commonwealth Dept. of Environmental Resources v. Pa. Power Co.*, 461 Pa. 675, 337 A.2d 823 (1975). The scope of review of a final decree in equity is limited and will not be disturbed unless it is unsupported by the evidence or demonstrably capricious. *Delp v. Borough of Harrisville*, 25 Pa.Cmwlth. 486, 360 A.2d 758 (1976).

*Id.*, 378 Pa.Superior Ct. at 6, 547 A.2d at 1250.

It is well established that "a court of equity has jurisdiction and, in furtherance of justice, will afford relief if the statutory or legal remedy is inadequate, or if equitable relief is necessary to prevent irreparable harm." *Martino v. Transport Workers' Union of Philadelphia*, 505 Pa. 391, 396, 480 A.2d 242, 244–245 (1984). See also: *Wood v. Goldvarg*, 365 Pa. 92, 95, 74 A.2d 100, 101–102 (1950) ("in order to oust equity jurisdiction, there must be a legal remedy that is adequate and complete."); *Chartiers Valley*

*School District v. Virginia Mansions Apartments,* 340 Pa.Super. 285, 294, 489 A.2d 1381, 1386 (1985); *South Coventry Township v. Philadelphia Electric Company,* 94 Pa.Cmwlth. 289, 299, 504 A.2d 368, 373 (1986). Moreover, "a court of equity has the power to afford relief despite the existence of a legal remedy when, from the nature and complications of a given case, justice can best be reached by means of equity's flexible machinery." *Hill v. Nationwide Insurance Co.,* 391 Pa.Super. 184, 188, 570 A.2d 574, 576 (1990), quoting *Peitzman v. Seidman,* 285 Pa.Super. 228, 234 n. 4, 427 A.2d 196, 199 n. 4 (1981). The *Hill* court discussed the concept of an adequate and complete remedy at law in greater detail.

> To induce equity to refuse its aid to a suitor, it is not sufficient that he may have some remedy at law. *An existing remedy at law* to induce equity to decline the exercise of its jurisdiction in favor of a suitor *must be an adequate and complete one.* And when from the nature and complications of a given case, its justice can best be reached, by means of the flexible machinery of a court of equity, in short where a full, perfect and complete remedy cannot be afforded at law, equity extends it jurisdiction in furtherance of justice.

*Id.,* quoting *Pennsylvania State Chamber of Commerce v. Torquato,* 386 Pa. 306, 329, 125 A.2d 755, 766 (1956), *cert. denied sub. nom. Bowman v. Pennsylvania State Chamber of Commerce,* 352 U.S. 1024, 77 S.Ct. 589, 1 L.Ed.2d 596 (1957).

 Under the Comprehensive Environmental Compensation Liability Act, 42 U.S.C. § 9601, et seq., as amended, ("CERCLA"), liability for cleaning up hazardous waste found on a property is determined by ownership. Ownership alone triggers liability even though an owner has not actively participated in generating or disposing of the hazardous substance. See, e.g.: *Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1572 (5th Cir.1988); *United States v. Stringfellow,* 661 F.Supp. 1053, 1063 (C.D.Cal.1987).

In *United States v. Maryland Bank & Trust Co.*, 632 F.Supp. 573 (D.Md.1986), the court was asked to determine "whether a bank, which formerly held a mortgage on a parcel of land, later purchased the land at a foreclosure sale and continues to own it, must reimburse the United States for the cost of cleaning up hazardous wastes on the land, when those wastes were dumped prior to the bank's purchase of the property." *Id.* at 574. The government argued that a bank, by virtue of its purchase of the facility at a foreclosure sale, was the "owner" and, therefore, liable for the clean-up. The bank countered that it was only protecting its security interest in the property, and CERCLA's definition of an "owner or operator", section 101(20)(A), 42 U.S.C. § 9601(20)(A), excluded from liability "a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the ... facility." The court rejected the bank's contention and held that a mortgagee who purchases the premises in order to protect its interest is liable for clean-up costs. In so holding, the court focused on the time period of the bank's security interest and found that foreclosure constituted "ownership" for purposes of CERCLA liability, since the security interest had expired upon foreclosure.

The United States District Court for the Western District of Pennsylvania reached a similar conclusion in *Guidice v. BFG Electroplating and Manufacturing, Co.*, 732 F.Supp. 556 (W.D.Pa.1989). In *Guidice*, a bank had purchased at sheriff's sale a piece of real estate in which it had previously held a security interest and held record title to the property for approximately nine months before conveying it to a third party. The property was subsequently found to be contaminated, and the bank was joined as a third party in a suit for damages. In deciding whether the bank was an "owner or operator" and liable for the clean-up under CERCLA, the court distinguished between the time frame prior to the bank's foreclosure and the period following the bank's purchase of the property. With regard to the for-

mer, the court held that the bank was protected from liability by the security interest exemption of CERCLA as there was "no evidence suggesting that the Bank controlled operational, production, or waste disposal activities at the [property]." *Id.* at 562. However, after the bank had purchased the property at a foreclosure sale, the court viewed its role differently.

> We find the concern expressed in *Maryland Bank & Trust,* that an exemption for landowning lenders would create a special class of otherwise liable landowners, and the failure of the 1986 amendments to specifically exempt mortgagees-turned-landowners persuasive. When a lender is the successful purchaser at a foreclosure sale, the lender should be liable to the same extent as any other bidder at the sale would have been.

*Id.* at 563.

In *United States v. Fleet Factors Corp.,* 901 F.2d 1550 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991), the Eleventh Circuit held that a lender could be found liable for CERCLA clean-ups if it had the capacity to affect hazardous waste disposal decisions even if it had not acquired the property.[1]

Finally, even the Environmental Protection Agency has recognized the potential for lender liability under the CERCLA statutory scheme. It has published a public notice in the Federal Register pertaining to **de minimis** landowner settlements under CERCLA. According to the EPA,

> Lenders may also be eligible for **de minimis** settlements in some circumstances. A lender who does not participate in the management of a facility and who only holds "indicia of ownership primarily to protect his security interest" is excepted from the definition of "owner or operator" and, therefore, is not liable. Section 101(20)(A)(ii). *If, however, a lender becomes an owner*

---

1. According to one commentator, the Eleventh Circuit's decision in *Fleet Factors* "has dramatically increased the lending community's awareness of potential CERCLA liability." Note, **Cleaning Up The Debris After Fleet Factors: Lender Liability And CERCLA's Security Interest Exemption,** 104 Harv.L.Rev. 1249, 1257 (1991).

*by foreclosing and taking title to the property*, or by conducting management activities at the site, *he is potentially liable*. Under these circumstances, the lender may be eligible for a **de minimis** settlement, if he meets the requirements of Section 122, *including that he demonstrates that he conducted "all appropriate inquiry" prior to acquisition of the facility*. (emphasis added). Public Notice, 54 Fed.Reg. 34235, 34238 (August 18, 1989).

█ In view of the current state of the law, therefore, it seems abundantly clear that foreclosure of the mortgage may not be a complete and adequate remedy when the mortgagor defaults. Equitable relief "depends not so much on the want of a common-law remedy, as upon its inadequacy and its exercise is a matter which often rests within the discretion of the court; in other words the court may take upon itself to say whether the common-law remedy is, under all the circumstances and in view of the conduct of the parties, sufficient for the purpose of complete justice...." *Cohen v. Pelagatti*, 342 Pa.Super. 626, 634–635, 493 A.2d 767, 771 (1985), quoting *Penn. Iron Co., Ltd. v. City of Lancaster*, 25 Pa.Super. 478, 483 (1904). Where foreclosure may result in the taking of title to environmentally damaged or contaminated real estate, equity may intervene to provide relief to an innocent lender.

█ However, a court of equity cannot create rights which have not been established by the terms of the mortgage or other agreement between the parties. Therefore, we must examine the terms of the mortgage to ascertain whether the right to conduct intrusive environmental tests was reserved to the mortgagee by the terms of the written mortgage.

The mortgage contains language allowing inspections of the premises by the mortgagee as follows:

15. *Inspections.* Mortgagor shall allow Mortgagee and its representatives to enter upon the Subject Property during normal business hours and upon reasonable advance notice to inspect the condition of the same and to

examine, copy and audit the books, records, accounting data and other documents of the Mortgagor or the party for whose benefit Mortgagor is acting relative to the Subject Property. Such inspections are solely for Mortgagee's benefit; to the extent the Subject Property or such books, records, accounting data are in the possession or control of others, then Mortgagor shall make the same available to Mortgagee.

This right of inspection must be construed according to its terms. The terms of the mortgage permit the mortgagee and its representatives to go upon the land to inspect the condition of the premises. The term "inspection" is defined in Black's Law Dictionary, 5th ed. 1979, as follows:

**Inspection.** To examine; scrutinize, investigate, look into; check over; or view for the purpose of ascertaining the quality, authenticity or conditions of an item, product, document, residence, business, etc.

Here, the mortgagee wishes to do more than examine, scrutinize, check over or view the premises; it wishes to dig holes in the mortgaged premises and conduct tests calculated to ascertain sub-surface conditions. This, we are constrained to conclude, is not included in the authorization to the mortgagee to "inspect" the premises. If the parties had intended the mortgagee to have the right to go upon the land and conduct intrusive environmental tests, they would not have relied upon language authorizing an "inspection" of the premises.

 The terms of the mortgage also authorize the mortgagee, in the event of default by the mortgagor,

"(d) to enter upon, possess, manage and operate the Subject Property or any part thereof; to make, terminate, enforce or modify leases of the Subject Property upon such terms and conditions as Mortgagee deems proper; to make repairs, alterations and improvements to the Subject Property necessary, in Mortgagee's judgment, to protect or enhance the security thereof."

This clause permits the mortgagee, in the event of default, to go into possession of the mortgaged premises and operate the same to protect its interest. Thus far, the mortgagee has not taken possession of the premises. However, the mortgage also permits the mortgagee, in the event of default, to make repairs, alterations and improvements "to protect or enhance the security thereof." This is broad enough to include environmental clean-ups, for certainly real estate which is environmentally clean has a greater market value than if it were environmentally contaminated. In order to determine whether environmental clean-up is necessary, according to the evidence in this case, phase two testing is necessary. The making of these tests, we conclude, was within the contemplation of the parties to the same extent as structural tests if preliminary examination revealed potential danger.

The trial court, as we have observed, determined that environmental testing was within the contemplation of the parties' agreement and that equitable relief was required because of the mortgagor's refusal to allow representatives of the mortgagee on the premises. We have examined carefully the proceedings in the trial court and conclude that the trial court's order does not represent either an error of law or an abuse of discretion.

Affirmed.

CAVANAUGH, J., concurs in the result.