February 3, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1225

WATERVILLE INDUSTRIES, INC.,

Plaintiff, Appellee,

v.

FINANCE AUTHORITY OF MAINE,

Defendant, Appellant.

No. 92-1338

WATERVILLE INDUSTRIES, INC.,

Plaintiff, Appellant,

v.

FINANCE AUTHORITY OF MAINE and
FIRST HARTFORD CORPORATION,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, District Judge]

Before

Breyer, Chief Judge,

Bownes, Senior Circuit Judge,

and Boudin, Circuit Judge.

Martha C. Gaythwaite with whom Harold J. Friedman, Friedman &

Babcock, Stephen A. Canders and Elizabeth Bordowitz were on brief for

Finance Authority of Maine.
Jotham D. Pierce, Jr. with whom Adam H. Steinman, Eileen J.

Griffin, and Pierce, Atwood, Scribner, Allen, Smith & Lancaster were

on brief for Waterville Industries, Inc.

February 3, 1993

BOUDIN, Circuit Judge. Waterville Industries, Inc.,

brought suit against the Finance Authority of Maine ("FAME")

seeking contribution to "response costs" assessed against

Waterville Industries by the Environmental Protection Agency

under the Comprehensive Environmental Response, Compensation

and Liability Act ("CERCLA"), 42 U.S.C. 9601 et seq.

FAME, claiming the protection of statutory exceptions to

CERCLA liability, appeals from the district court's decision

that it is responsible for 60 percent of those costs.

Waterville Industries cross-appeals from the district court's

refusal to order FAME to contribute to its attorneys' fees.

We conclude that FAME is exempt from contribution under

CERCLA and therefore do not reach the cross-appeal relating

to the amount of contribution.

I.

This action arises out of efforts to clean up two waste

water lagoons located at a defunct textile mill in

Waterville, Maine. Although the genesis of the mill is

neither clear from the record nor critical to the case, it

appears that the First Hartford Corporation developed the

mill in the early 1970's with state assistance.1 In or

1First Hartford's role was carried out by two related
corporations, First Hartford Corporation and First Hartford
Realty Corporation; the latter held the lease on the real
property in question but subleased it to First Hartford
Corporation. We refer throughout the opinion to the dual
enterprise as "First Hartford."

-3-

about 1972, First Hartford acquired the property, sold it to

Waterville Textile Development Corporation -- a quasi-public

corporation unconnected with the appellee in this case -- and

then leased it back. Loans in connection with the project

were made to First Hartford by Society for Savings, an out-

of-state lender, and secured by mortgages on the property,

which Society for Savings held. The loans were guaranteed by

appellant FAME, an instrumentality of the state of Maine.2

In 1980, First Hartford defaulted on the loans. As a

result, FAME pursuant to its guarantee made substantial

payments to Society for Savings to cure the defaults, assumed

First Hartford's future obligations to Society for Savings,

and received from the latter an assignment of the mortgages.

On the same day that it received the mortgages, March 14,

1980, FAME accepted a deed in lieu of foreclosure from

Waterville Textile Development Corporation and became the

holder of title to the property.

On the same day, FAME leased the property back to First

Hartford to allow First Hartford to continue to operate the

mill. The new lease required First Hartford to make monthly

payments directly to Society for Savings to cover obligations

coming due on the original debt which FAME had assumed. The

2In 1972, FAME's functions were carried out by the Maine
Industrial Building Authority. That entity was later
succeeded by the Maine Guarantee Authority which was in turn
succeeded by FAME. In this opinion, we will for simplicity
refer to the successive entities as "FAME."

-4-

lease also required First Hartford to pay an additional

$22,340 per month directly to FAME. During the period in

which First Hartford operated the mill as a lessee of FAME,

First Hartford released certain hazardous wastes into two

lagoons associated with the mill.

First Hartford continued to experience financial trouble

after the March 14, 1980, transactions, and filed for Chapter

11 bankruptcy protection on February 20, 1981. First

Hartford ceased operations at the mill on October 6, 1981.

Apparently a dispute then occurred between First Hartford and

FAME as to whether First Hartford had a continuing interest

in the property. This dispute was resolved in a "settlement

stipulation" approved by the bankruptcy court on July 29,

1982, which provided that "title to the Real Property is

vested solely in [FAME]," but which gave First Hartford until

October 15, 1982, to find a buyer for the property.

First Hartford did not find a buyer by October 15, 1982,

and on or about March 29, 1983, FAME contracted with an

auctioneer to sell the property. An auction was held on

August 19, 1983, and MKY Realty was the high bidder. On

September 23, 1983, FAME and MKY Realty entered into a

contract for the sale of the property, and on November 15,

1983, FAME conveyed the property to Gano Industries, the

nominee of MKY Realty. Gano Industries later changed its

name to Waterville Industries, the appellee in this case.

-5-

II.

In September 1988, the EPA filed an administrative

complaint against Waterville Industries seeking penalties and

response costs under CERCLA in connection with the clean-up

of the lagoons. As the current owner of the property,

Waterville Industries was liable for such costs under the

statute. 42 U.S.C. 9607(a)(1). Waterville Industries

entered into a consent agreement with EPA to clean up the

property. It has now incurred substantial engineering costs

in connection with the clean-up, and further expenses are

expected. Waterville Industries then brought this action

pursuant to CERCLA contending that FAME, as a former owner

of the property, is liable for contribution. 42 U.S.C.

9613(f) (authorizing contribution action against "any other

person who is liable or potentially liable" for clean-up

costs).

CERCLA holds several categories of persons liable for

the clean-up of hazardous substances at a facility, including

"any person who at the time of disposal of any hazardous

substance owned or operated any facility at which such

hazardous substances were disposed of[.]" 42 U.S.C.

9607(a)(2). Waterville Industries argues that FAME is liable

for contribution because it "owned" the property between

March 14, 1980, and October 6, 1981, during which time

hazardous substances were released into the lagoons by First

-6-

Hartford. The statute, however, contains exceptions to the

definition of an "owner," one of which excludes from that

status "a person, who, without participating in the

management of a vessel or facility, holds indicia of

ownership primarily to protect his security interest in the

vessel or facility." 42 U.S.C. 9601(20)(A).

FAME has contended throughout the litigation that it

falls within this security interest exception from CERCLA

liability. Waterville Industries' main response is that when

FAME accepted a deed in lieu of foreclosure on March 14,

1980, it "became the owner in fee simple of the land, and the

mortgages merged into the deed and disappeared." At that

point, Waterville Industries argues, FAME no longer had a

"security interest" to protect because it was the outright

owner of the property, and therefore the secured creditor

exception by its terms became inapplicable. The district

court accepted this reasoning, holding:

From March 14, 1980, to October 6, 1981 [the date
First Hartford ceased operations,] [FAME] was an
owner with a leasehold relationship to the operator
and was during that time no longer protecting a
security interest as it might have been had it been
a mortgagee or as it might have done prior to its
taking the March 14, 1980, deed.

Our own analysis begins with the construction of

CERCLA's security interest exception, plainly an issue of

-7-

law.3 The purpose of the exception, apparent from its

language and the statutory context, is to shield from

liability those "owners" who are in essence lenders holding

title to the property as security for the debt. Congress may

have been concerned with maintaining sources of credit or may

have thought that CERCLA's far-reaching liability should be

limited to those owners who had the real equity interest in

the property. In all events, legislative history and case

law confirm that Congress had in mind not only the classic

case of the bank mortgage but also equivalent devices serving

the same function, such as lease financing arrangements.4

Our review of the record persuades us that what FAME

received from Waterville Textile Development Corporation

through the March 14, 1980, transactions was the nominal

title typical of the lender in a lease financing transaction.

Waterville Textile Development Corporation was a quasi-public

development corporation used in connection with the 1972

loans in order to hold title to the property; it purchased

3In this case, we have accepted the trial court's
findings of fact, as supplemented by other facts drawn from
the record. In re Crown Sportswear, Inc., 575 F.2d 991, 993

(1st Cir. 1978).

4See H.R. Rep. No. 172, pt. 1, 96th Cong., 1st Sess. 36

(1979) (an "owner" does not include a person who "hold[s]
title . . . in connection with a lease financing arrangement
under the appropriate banking laws, rules or regulations");
In re Bergsoe Metal Corp., 910 F.2d 668 (9th Cir. 1991)

(lease financing is a security interest under CERCLA).

-8-

the property from First Hartford for $1 and then leased it

back to First Hartford. That lease in turn gave First

Hartford an option to buy the property for $1 at the end of

the lease (or, based on formula payments, even before the

lease expired if it chose). This is an ordinary lease

financing arrangement, commonly called a sale and lease back.

See, e.g., In re PCH Assocs., 949 F.2d 585, 599-600 (2d Cir.

1991).

When FAME acquired title from Waterville Textile

Development Corporation on March 14, 1980, it simultaneously

re-leased the property to First Hartford, altering the

payment terms as already described. But the new lease, which

is part of the record, also provides that "[e]xcept as

modified or referred to by the terms of this Agreement, in

all other respects, the Underlying Leases and Sublease

between [Waterville Textile] Development, [First Hartford]

Realty and First Hartford shall remain in full force and

effect." Thus, First Hartford's payment obligations were

altered but its option to buy the property for $1 remained in

force and the lease financing character of the transaction

remained unchanged.

The payments required under the new March 14, 1980,

lease reinforce our conclusion. First Hartford was committed

to continue payments to Society for Savings just as before

and also to make monthly payments of just over $22,000

-9-

directly to FAME. Although Waterville Industries points to

the latter payment as "profits" inconsistent with the

supposed passive- lender role of FAME, the lease shows that

the total payments were to be limited to $868,982. We think

the fair inference from this limitation supports FAME's

explanation that the payments to it were intended to repay

FAME for its own payments to Society for Savings made under

the guarantee in order to cure First Hartford's own default.

There are yet other signs that FAME's interest was that of a

security holder.5

We think that the able district judge may have been

misled on the security interest issue by the failure of the

parties to develop the precise rights of First Hartford

under the March 14, 1980, lease, including (by incorporation

of the original 1972 lease) the option to purchase for $1.

Although the security interest exception was argued

vigorously on both sides in this court, the facts as to the

option are not mentioned in the briefs. If FAME had re-

leased the property to Waterville Industries on March 14,

1980, without continuing the purchase option, our line of

analysis would be different and FAME's current position could

be weaker.

5For example, First Hartford continued to be responsible
for real estate taxes and the payment schedule provided that
the monthly sums payable to FAME were to be applied first to
"interest," which suggests repayment of a debt.

-10-

Our view of the matter accords with that of the Ninth

Circuit in In re Bergsoe Metal Corp., 910 F.2d 668 (9th Cir.

1991). There the court upheld the exemption claim under the

security interest exception of a titular owner who held title

to property merely as security in a sale-and-lease-back

transaction. While there are factual distinctions, the

holding and thrust of the case supports FAME's exempt status

in the year following March 14, 1980. We note also that EPA

has recently adopted regulations declaring that the security

interest exception applies to "title held pursuant to lease

financing transactions." 40 C.F.R. 300.1100(b)(1). These

regulations do not govern for they were not in effect at the

time of the events in this case.6 Since our reading of the

statute on this issue does not rest upon the regulations, we

need not resolve arguments between the parties concerning the

weight to be accorded to the EPA's views.

The more difficult problem for FAME is its status under

the exemption after October 6, 1981, when First Hartford

ceased operation. Thereafter--precisely when is less

certain--First Hartford presumably lost its rights under the

lease and, as sometimes happens to security holders, FAME's

titular ownership became real and no longer merely a security

6The regulations are currently under review in the D. C.
Circuit in cases not yet briefed or argued. Michigan v. EPA,

C.A. No. 92-1312 (Pet. filed July 28, 1992); Chemical Mfrs.

Ass'n v. EPA, C.A. No. 92-1314 (Pet. filed July 28, 1992).

-11-

interest. However, we think such a maturation of ownership

does not divest the owner of protection under CERCLA's

security interest exception so long as the owner proceeds

within a reasonable time to divest itself of ownership. Why

this is so, and how FAME then fares under this reading of the

statute, are separate questions which we address in that

order.

Admittedly, CERCLA itself does not explicitly provide

any period for divestiture after the collapse of a financing

arrangement, but such a "safety zone" seems to us implicit in

the statute. Were it otherwise, every sale and lease-back

arrangement would subject the lender-lessor to the risk of

sudden CERCLA liability whenever the lessee, by default or

otherwise, lost its contractual rights to regain full

ownership. So long as the lender-lessor makes a reasonably

prompt effort to divest itself of its unwelcome ownership, we

think continued coverage under the exception serves its basic

policy: to protect bona fide lenders and to avoid imposing

liability on "owners" who are not in fact seeking to profit

from the investment opportunity normally presented by

prolonged ownership. The sparse case law on this point is

divided with two decisions supporting our approach and one

opposed.7

7Supporting our view are United States v. Mirabile, 15

Envtl. L. Rep. 20994, 20996 (E.D. Pa. 1985), and In re T.P.

Long Chem., Inc., 45 Bankr. 278, 288-89 (Bankr. N.D. Ohio

-12-

EPA has followed the same path in its new regulations.

It provides a safe harbor of 12 months within which the

security interest holder may take title and offer the

property for sale, noting that one who delays longer "may

still be able to show that it has acted consistently with the

exemption . . . ." 57 Fed. Reg. 18,344, 18,364 (Apr. 29,

1992). Again, we have reached our own conclusion

independently of the regulations, which technically do not

apply to pre-adoption events. Certainly EPA's choice of 12

months for its safe harbor cannot govern this case, for such

bright-line rules make sense only when known to affected

parties in advance. Instead, we think the question is

whether, under all the circumstances, FAME acted reasonably

promptly to divest itself of ownership once the lease

arrangement ended.

The earliest time that one would expect a security

holder to start to divest itself of unwelcome ownership would

ordinarily be when the security holder obtained full title

free of serious encumbrances. So long as First Hartford held

a lease with an option to buy for $1, FAME was still only a

1985). At odds with our approach is Guidice v. BFG

Electroplating & Mfg. Co., 732 F. Supp. 556 (W.D. Pa. 1989),

unless a voluntary purchase at a mortgage foreclosure sale is
distinguished from the automatic termination of a lease.
Finally, United States v. Maryland Bank & Trust Co., 632 F.

Supp. 573 (D. Md. 1986), relied upon by Waterville, does not
reach our issue, the foreclosing mortgagee in that case
having failed promptly to resell the property after
foreclosure.

-13-

security holder protected by the exception. First Hartford

filed for Chapter 11 reorganization on February 20, 1981, and

ceased operation of the mill on October 6, 1981. FAME then

filed an application in the bankruptcy proceeding seeking an

order declaring it the owner of the property and directing

First Hartford to surrender possession; First Hartford

opposed the application. Not until July 15, 1982, did First

Hartford and FAME enter into a stipulation that "affirmed

that title to the real property was vested solely in [FAME's

predecessor] and terminated the rights of First Hartford and

First Hartford Realty in the various leases."8 Even then

First Hartford was given until October 15, 1982, to seek a

buyer for the property.

Thus, it was only after October 15, 1982, that FAME was

finally in a position to give an unclouded and unencumbered

title to a purchaser. Within six months of that date, FAME

had contracted (in late March 1983) with an auctioneer to

sell the property. After an auction, FAME agreed (in

September 1983) to sell the property to MKY Realty, the

successful auction bidder, and it conveyed title not long

afterwards (in November 1983). Based on this sequence of

8The stipulation provided that "First Hartford and
Realty waive any and all rights or claims to be declared the
legal or equitable owner of the real property." First
Hartford was also granted a right to the proceeds of any sale
so far as they exceeded a specified sum, apparently computed
to approximate FAME's own past and pending debts on the
guarantees.

-14-

events, we think it is apparent that FAME made diligent

efforts to dispose of the property in a timely fashion: until

October 1981, FAME had only a security interest; a quarrel

over First Hartford's interest delayed matters until October

1982; and within six months thereafter, FAME had placed the

property on the market leading to its sale within the year.

III.

In conclusion, we are satisfied based on the record that

FAME is fully protected by the security interest exception.

Waterville Industries complains bitterly in its brief that

FAME sold it the property through MKY Realty without making

full disclosure of the hazardous wastes or of notices of

violation sent to FAME, and there is separate litigation

between the parties on this subject. But the right of

contribution under CERCLA is a statutory one that here turns

solely on FAME's status as an "owner," a status defeated by

the security interest exception. Waterville Industries'

other claims against FAME, whatever their nature or merits,

are a matter for another forum.

Having resolved the case based on the security interest

exception, we do not reach FAME's separate claim that it is

also protected by the provision exempting a state unit that

acquires ownership "involuntarily . . . by virtue of its

function as sovereign." 42 U.S.C. 9601(20)(D). This

exemption, which the district court rejected on the ground

-15-

that the acquisition was voluntary, presents difficult

problems of interpretation that we need not address.

Similarly, our reversal of the award of contribution makes it

unnecessary to consider the cross-appeal of Waterville

Industries seeking attorneys' fees as part of that

contribution.

Reversed.

-16-